713 So.2d 618 (1998)
Michael W. WHITE, Plaintiff-Appellant,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant-Appellee.
No. 97-1704.
Court of Appeal of Louisiana, Third Circuit.
April 29, 1998.
*620 Lawrence N. Curtis, Lafayette, Sue Fontenot, Abbeville, for Michael W. White.
Preston D. Cloyd, Lafayette, for State Farm Mutual Automobile Insurance Company.
Wayne G. Zeringue, Jr., New Orleans, Suzanne Michele Ray, for Texaco, Inc.
Before WOODARD, AMY and GREMILLION, JJ.
WOODARD, Judge.
The plaintiff, Michael W. White (White), appeals the trial court's dismissal of the suit he brought against his automobile liability insurer, State Farm Mutual Automobile Insurance Company (State Farm), to recover underinsured motorist benefits for injuries he sustained in an automobile collision. For the reasons assigned below, we affirm.

FACTS
On November 7, 1992, Rhett Madere (Madere), the driver of a 1989 Dodge, rearended a 1985 Volvo driven by White, who was transporting his minor children at the time and had stopped at a red traffic light. White, thirty-nine years old at the time of the accident, was pursuing a degree in industrial technology at the University of Southwest Louisiana (USL).
White sought medical attention in December of 1992 from Dr. John Cobb (Dr. Cobb), an orthopedic surgeon at the Lafayette General Medical Center (Lafayette General), complaining of pain in his neck, left leg, and lower back area. Dr. Cobb later referred White to Dr. Michael Berard (Dr. Berard), a clinical psychologist. Neither of White's children sought medical treatment after the accident. White continued his academic studies at USL into the spring of 1994, and some time after moving to New Orleans, discontinued his education. He and his family are now residing in Texas.
White alleges that the accident aggravated a previous physical injury which he sustained in October of 1984 while working for Texaco, Inc. (Texaco) as a mechanic. After some pipes struck him, he developed pain in his left shoulder, which radiated into his lower back and the back of his leg. His emergency room physician was Dr. R. Miers of Lafayette General. White was unable to return to his position at Texaco, and in October of 1986, returned to Lafayette General with complaints of pain. He was subsequently treated by Dr. Michel Heard (Dr. Heard) and Dr. Luiz deAraujo (Dr. deAraujo), who later performed a lumbar microdiscectomy on him to reduce the pain. White was discharged with a herniated intervertebral disc. After moving to Monroe, he saw Dr. Luis Gavioli (Dr. Gavioli) from December of 1987 through May of 1992.
He also contends that the automobile accident aggravated a pre-existing anxiety disorder which surfaced after the Texaco incident. Before the automobile accident, White was under the care of Dr. David Hebert (Dr. Hebert), an internal medicine specialist, from September of 1987 to May of 1992, and was given medication such as Prozac for his condition.
Following the accident, Madere's liability insurer, Allstate Insurance Company (Allstate), settled with White and paid him the policy limit of $10,000.00. White then brought suit against his uninsured/underinsured motorist carrier, State Farm, and Texaco intervened seeking to recover benefits that it paid as a result of the work-related accident. On July 31, 1997, a jury found that White was not injured as a result of the November 7, 1992 accident. By judgment dated September 12, 1997, the trial court dismissed his claim and Texaco's intervention *621 with prejudice. White devolutively appeals from that judgment. Texaco has taken no action in this matter.

ASSIGNMENTS OF ERROR
White asserts the following errors on appeal:
1. The jury's finding that he was not injured in the November 7, 1992 automobile accident is clearly wrong.
2. The trial court erred in instructing the jury that it could consider the magnitude and nature of the automobile collision in determining the extent of his injuries without cautioning the jury that it should not attempt to measure his injuries in direct proportion to the degree of force of the collision, and that it should not consider the force of the collision as the only determining factor in assessing the severity of his injuries.
3. The jury erred in failing to award damages.

LAW
As liability was stipulated to in this case, the only issues on appeal are that of causation, that is, whether White sustained injuries as a result of the November 1992 accident (and if so, the damages to be awarded) and whether the trial judge failed to properly instruct the jury on the issue of force of impact.
It is well settled that a court of appeal may not set aside a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). However, White urges that another standard of review may be applicable in this case since one of the assignments of error alludes to an erroneous jury instruction. When a reversible error of law is committed, an appellate court must "redetermine the facts de novo from the entire record and render a judgment on the merits." Rosell, 549 So.2d at 850 n. 2 (citations omitted). See also Lasha v. Olin Corp., 625 So.2d 1002 (La.1993). Therefore, in order to ascertain the correct standard of review to apply in this case, we must first determine whether the jury was erroneously instructed.

JURY INSTRUCTIONS
The trial court instructed the jury that "[t]he magnitude and nature of an automobile accident is a fact which may be considered by a jury in determining whether the plaintiff was injured in that accident." White asserts that the trial court should have also cautioned the jury that it should not attempt to measure his injuries in direct proportion to the degree of force of the collision and that it should not consider the force of the collision as the only determining factor in assessing the severity of his injuries.
In determining whether the judge carefully instructed the jury, we note that "[t]he trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; he must, however, correctly charge the jury." See Doyle v. Picadilly Cafeterias, 576 So.2d 1143, 1152 (La.App. 3 Cir.1991) (citation omitted). Adequate jury instructions are those which "fairly and reasonably point up the issues and provide correct principles of law for the jury to apply to those issues." See Lee v. Automotive Cas. Ins. Co., 96-517 (La.App. 3 Cir. 11/6/96); 682 So.2d 995, 997, writ denied, 96-2949 (La.1/31/97); 687 So.2d 409 (citation omitted). Great restraint must be exercised before overturning the jury's verdict in this case "unless the proposed jury instructions are so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts." Id. (Citation omitted.)
We first note the discretionary nature of this instruction. The trial court instructed the jury that it "may" consider the force of the accident in determining whether White was injured in the accident. In addition, the jury charge given was an accurate statement of the law. This court has "held that the minimal or minor nature of an automobile accident is a fact which may be considered by the jury." Fletcher v. Langley, 93-624 (La. App. 3 Cir. 2/2/94); 631 So.2d 693, 695, writ denied, 94-521 (La.4/7/94); 635 So.2d 1139 (citations omitted). See also Coleman v. U.S. Fire Ins. Co., 571 So.2d 213 (La.App. 3 Cir. 1990). Further, any attempt to argue that *622 this one jury instruction prejudiced White's rights is pure speculation, absent proof of its impact on the jury. Since the jury instruction complained of is a correct pronouncement of the law, the trial judge did not improperly instruct the jury. Accordingly, the manifest error standard of review applies to our analysis of the remaining issues.

CAUSATION
The jury found that no injuries were sustained. In order to reverse the fact finder's determination, we must find that a reasonable factual basis does not exist for the finding and that the finding is clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993).
White's burden in this case includes proving both his injuries and a causal connection between the injuries and the tort, by a preponderance of the evidence. See Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971). Despite White's preexisting condition, he is still entitled to compensation if the negligent act aggravated that condition. See Perniciaro v. Brinch, 384 So.2d 392 (La. 1980). A causal link must be established between the negligent act and the degree of aggravation. See Harrigan v. Freeman, 498 So.2d 58 (La.App. 1 Cir.1986).
Based on our review, we find that the record furnishes a reasonable basis for the jury's finding that the automobile accident did not cause White's injuries; he had a preexisting condition, the symptoms of which continued to manifest themselves up until the time of the accident. In evaluating causation, we considered White's medical condition before and after the accident in question.

Physical Condition
The record establishes that White had significant preexisting orthopedic injuries and that since the 1984 work-related accident, he has continued to receive active medical treatment from various physicians. Dr. Heard, who treated him in 1986, noted in his patient history report that, White "has been complaining of left shoulder pain and low back pain."
The medical records and deposition testimony of Dr. Gavioli, an orthopedic surgeon who treated White from December of 1987 to May 20, 1992, substantiates that White continued to suffer from lower back pain as late as May of 1992. When White commenced treatment with Dr. Gavioli he "presented ... complain[ts] of pain in his back and left leg" and "related to [Dr. Gavioli] that he had had an injury approximately three years earlier when some pipes struck him." White continued to voice similar complaints during his remaining treatment with Dr. Gavioli, as evidenced by the following accounts given by Dr. Gavioli at his deposition and in his medical records: May 12, 1988: White returned to his office "with the same basic complaints of pain.... His examination was basically the same"; May 17, 1988: White had a MR scan which was "consistent with him having had a disc rupture ... and then having degenerative changes...."; October 27, 1988: White "continued to have some pain in his low back.... His exam again was basically the same"; November 30, 1988: "No major changes really in his examination"; January 5, 1989: White's "examination was unchanged"; February 1989: White's lumbar MRI scan and myelogram and CT scan were "consistent with postoperative changes at the L4 disc level, with only mild disc bulging and mild scar formation but no apparent significant impingement on the neutral structures"; March 9, 1989: White's "complaints were basically the same, low back, left leg. His exam was basically the same"; November 15, 1989: White "continu[ed] to complain of problems with pain in his low back, pain and numbness in the left leg down to the foot"; February 28, 1990: White's "[c]omplaints were basically the same.... No major changes in his examination"; January 10, 1991: "His conditions and limitations are basically unchanged"; August 22, 1991: White's "[c]omplaints were basically the same, pain in the back, left leg. Findings were basically the same. Impression the same.... His overall condition and limitations were unchanged"; and May 20, 1992: White told Dr. Gavioli that "over the course of about the last six months he'd had a couple of episodes of rather severe pain in his low back which lasted for about a week." Based on his four and a half year treatment of White, Dr. Gavioli opined that he could state with a degree of medical certainty that White *623 "would probably continue to have episodes... of increased pain."
The observations of Dr. Cobb, an orthopedic surgeon who first saw White on December 14, 1992, about five weeks after the accident, are similar to those made by Dr. Gavioli from 1987 to 1992. Dr. Cobb testified that a lumbar MRI revealed "postlaminectomy syndrome[,]" which is "a set of symptoms associated with a person who has had surgery and disc incised." He also testified that a cervical MRI indicated "mild spondylosis" at the L5-6 level. Dr. Cobb last saw White in March of 1995 and testified that "my impression was about the same, that he was having symptoms from the postlaminectomy syndrome with some instability in the L 5[sic] nerve being inflamed and painful." When Dr. Cobb was asked at trial if he found, as Dr. Gavioli did, that "White presented with classical L 5[sic] radiculopathy[,]" Dr. Cobb responded affirmatively. Moreover, Dr. Cobb noted that "[t]here is no question that I think he had some problems with his back and perhaps his leg before."
Dr. John Schulte, an orthopedic surgeon who performed an independent medical examination on White on May 2, 1997, and reviewed the medical records of Dr. Gavioli, Dr. deAraujo, Dr. Heard, Dr. Cobb, Lafayette General and Our Lady of Lourdes Hospital, opined that there were no objective findings of any change in White's physical condition before the accident. He testified "I did not see any difference in his spine from a physical standpoint as far as the examinations he had earlier, and also on his radiological studies of his discs."
Moreover, in White's corrections to his deposition testimony of April 12, 1994, he admits that he was treated after the 1986 disc removal "until date of auto accident."

Emotional Condition
As documented by Dr. Hebert, a primary care physician who treated White from September of 1987 to May of 1992, White underwent extensive psychological treatment and was taking anti-depressants, such as Zoloft, for an anxiety disorder that surfaced before the automobile accident. Dr. Hebert's impression of White after his first consultation with him in September of 1987 "was that he had classical anxiety[,]" a disorder that was characterized by intermittent panic attacks. Dr. Hebert testified that in addition to voicing complaints of pain in the lumbar spine, left arm, and left leg, White continued to complain of anxiety during his treatment, as evidenced by the following testimony given at his deposition and from the notes in his medical records: December of 1987: "At that time he told me that he was having panic attacks"; February of 1988: "He was still having panic attacks then"; May of 1988: confirmed that White "was having difficulty with daily routines"; January of 1989: White "still described episodes of palpitations and rapid heart rate"; June of 1989: White complained of "increased episodes of anxiety"; June of 1990: White "was still having classical panic or anxiety attacks"; January of 1991: complained that "his anxiety had really gotten very bad.... He stated that for the last three days he had had a lot of anxiety and been essentially nonfunctional"; July of 1991: White's "anxiety level has been quite high"; and May of 1992: White "had a severe panic attack in the office with hyperventilation, numbness of the hands and feet, GI distress...." When Dr. Hebert was asked if, according to his observations in 1991, he was still confident as to his diagnosis that White was suffering from chronic anxiety, Dr. Hebert responded, "Absolutely." Dr. Hebert also noted that White's condition was "one of the worse anxiety cases I have seen, and he deserves first class psychiatric care" and that "[y]ou would have thought that with the level of anxiety he has he would have been seeking medical help earlier, yes." White's panic attacks were of such a nature that he requested excuses from Dr. Hebert to give to his professors requesting more time during his examinations. More important, Dr. Hebert testified that the type of psychological condition suffered by White after the Texaco incident is not usually trauma induced, but is "something we're born with." Further, he noted that "there's no way that an accident causes generalized anxiety disorder." When asked what brought about White's panic attacks, Dr. Hebert responded, "Sometimes they just occurred *624 out of the blue with absolutely no precipitating factor, and sometimes they occurred during stressful times at college.... They do seem to be precipitated by stress, like having to perform for a test, and they sometimes occur when everything is just wonderful." Dr. Hebert also remarked, "The odds are overwhelming that this is a problem he is going to have off and on all his life."
Dr. Michael Berard, a clinical psychologist, also conducted independent medical examinations on White in March of 1993 and engaged in about twelve sessions with him until January of 1995. Dr. Berard testified that he received referrals from Dr. John Stafford who informed him that White "was experiencing panic disorder or an anxiety disorder" and from Dr. Cobb, who told him that White "was experiencing psychological problems and other types of symptoms." Although White was prescribed Prozac, Dr. Berard testified that White stopped taking it around April of 1993 because he "had some side effects that he perceived as uncomfortable...." Based on his own findings, Dr. Berard observed that White suffered from the anxiety disorder as early as 1986 and exhibited symptoms sporadically since that time.
Dr. Ted Friedberg (Dr. Friedberg), a clinical psychologist and clinical neuropsychologist who performed an independent examination on White for State Farm in January of 1995, observed that White "had been diagnosed with a generalized anxiety disorder, and this had been diagnosed since early in 1986, and a lot of the symptoms had persisted on and off from that time. And this seemed to be a relatively consistent diagnosis apparently." After conducting several tests, Dr. Friedberg concluded that White's anxiety problem was a "long standing" one. When asked if the automobile accident aggravated White's condition, he opined that "I think in his situation it certainly irritated or added to his problems, but I didn't find it to be a debilitating type of trauma, considering the problems that pre-existed that accident."

Other Facts and Circumstances:
We also examined other facts and circumstances in this case. First, White's consistent performance in his educational studies, after the accident through the summer of 1993, and his ability to continue his education until the spring of 1994 suggest that his physical and mental abilities were not immediately significantly affected by the accident.
Second, the absence of medical evidence to establish causation supports the observations of the investigating officer. Officer Richard Rees (Officer Rees) of the Lafayette City Police Department testified that when he came upon the scene to investigate, neither White nor Madere reported any injuries sustained. According to Officer Rees, White's car did not move after the impact. Even White admitted that his car "moved just a little bit." In assessing property damage, Officer Rees noted minor damage to both vehicles. Furthermore, White stated in his deposition testimony that the damage to his car consisted of a damaged bumper and two tail lights. In fact, he accepted a property damage check in the amount of $400.00 or $500.00 from Allstate and repaired the damage to the vehicle himself ("I bought some taillights myself and just stuck them in.") Furthermore, although Allstate paid White for the bumper, he admitted at his deposition that he "never replaced that."
Based on a totality of the circumstances, we hold that White did not meet his burden of proving that the accident aggravated his preexisting injury. Therefore, we find no manifest error in the jury's finding that White was not injured in the accident. The evidence supports the jury's refusal to award personal injury damages.

CONCLUSION
Accordingly, the judgment of the trial court is affirmed. Costs of this appeal are assessed to White.
AFFIRMED.