WHIPPLE, J.
12In this motorcycle-vehicle collision case, plaintiffs appeal the trial court’s judgment dismissing their case with prejudice. For the following reasons, we affirm in part and reverse in part.
FACTS AND PROCEDURAL HISTORY
On the evening of August 26, 2005, plaintiffs, Daniel and Alisa Walley, were involved in a motor vehicle accident when their 2006 Harley Davidson motorcycle, which was being operated by Daniel and on which Alisa was a passenger, was struck by a 2001 Chevrolet truck being driven by Regina Vargas. The Walleys were traveling westbound on Rushing Road in Denham Springs, approaching the intersection of Rushing Road and Range Avenue, an intersection controlled by a traffic signal. Daniel Walley, who intended to turn left onto Range Avenue at the traffic signal, entered the left-turn lane and was then struck by Vargas as she attempted to make a left turn into the eastbound lane of travel on Rushing Road from a private driveway of a shopping center.
Thereafter, on October 11, 2005, plaintiffs filed suit for damages as a result of the accident, naming as defendants Vargas and Vargas’s insurer, American Family Mutual Insurance Company (“American Mutual”).[1] A bench trial was conducted in this matter on June 29 and 30, 2011. At trial, conflicting testimony was presented as to whether, in an effort to reach the left-turn lane, Daniel had crossed the double-yellow, center dividing line into the oncoming, eastbound traffic lane and passed stationary cars in the westbound lane, whether he had entered the left-turn lane in the yellow lined [ Rarea where the left-turn lane was beginning to form, but not yet fully formed, or whether he entered the left-turn lane when it was permissible to do so.
Following trial, by judgment dated October 6, 2011, the trial court, finding that Daniel Walley was the sole cause of the accident, rendered judgment in favor of Vargas and American Mutual. Additionally, the judgment ordered that pursuant to defendants’ motion for directed verdict, defendants were to receive a $10,000.00 credit for any damages sustained by plaintiff Daniel Walley.
From this judgment, plaintiffs appeal, contending that the trial court erred in:
(1) Ruling that the investigating officer was not unavailable to testify under LSA-C.E. art. 804(A)(3) and therefore that his deposition testimony could not be introduced into evidence under LSA-C.E. art. 804(B)(1);
(2) ruling that the investigating officer could not have his memory refreshed or be impeached by his deposition after the trial court ruled that the witness was not unavailable under LSA-C.E. art. 804(A)(3);
(3) granting defendants’ oral motion for directed verdict on the issue of “No Pay/No Play” pursuant to LSA-R.S. 32:866;
(4) allowing defendant Vargas to elicit speculative testimony, contrary to LSA-C.E. art. 701, as to where plaintiffs’ motorcycle was prior to impact, where defendant Vargas testified that she did not know where the motorcycle was prior to impact and where all speculation/opinion testimony was ruled to be excluded in plaintiffs’ motion in limine;
*98 (5) allowing hearsay statements by a witness to the accident to be introduced at trial despite her absence when she was available as a witness;
14(6) failing to place the burden on defendant Vargas to disprove her liability when she was making a left turn out of a private drive that resulted in the accident, pursuant to LSA-R.S. 32:122 and LSA-R.S. 32:124; and
(7) finding defendant Vargas without fault when her testimony included multiple inconsistencies, after testifying she was looking in the opposite direction of oncoming traffic and failing to carry her statutory burden of proof.
DISCUSSION
Introduction and/or Use of the Investigating Officer’s Deposition (Assignments of Error Nos. 1 & 2)
In their first assignment of error, plaintiffs contend that the trial court erred in ruling that Officer Matt Martello, the investigating officer, was not “unavailable as a witness” pursuant to LSA-C.E. art. 804(A)(3) due to his memory loss and, thus, in refusing to allow them to introduce Officer Martello’s deposition testimony at trial pursuant to LSA-C.E. art. 804(B)(1). Alternatively, in their second assignment of error, plaintiffs argue that, given the trial court’s finding that Officer Martello was not “unavailable” due to memory loss, the trial court erred in refusing to allow plaintiffs to use his deposition testimony to either refresh his memory during his trial testimony or for impeachment purposes.
In the years after investigating this accident and completing an accident report, Martello suffered two serious medical situations. Specifically, Martello suffered from gunshot wounds on the job in September of 2006, and, thereafter in April 2009, he suffered from a stroke, which he acknowledged at trial affected his ability to recall past events. Subsequent to his gunshot wound, but prior to his stroke, Mar-tello had given La deposition in this matter, the attempted use of which is the subject of these assignments of error.
With regard to his memory deficits resulting from his stroke, when asked at trial if he remembered working this accident, Martello responded that he remembered the motorcycle, but that was “about all.” Moreover, although Martello testified that he was familiar with the scene where this accident occurred, during questioning of Martello by plaintiffs’ counsel, Martello was clearly confused as to the events of this accident and unable to recall the circumstances of his investigation. He also had no recollection of interviewing either driver involved in the accident. Furthermore, when plaintiffs’ counsel questioned Martello as to his previous testimony under oath, Martello responded that he did not remember. Thus, plaintiffs’ counsel then sought to introduce Martello’s previous deposition into evidence on the basis that Martello’s lack of memory rendered him unavailable as a witness.
Defense counsel objected to the introduction of Martello’s deposition on the bases that Martello’s deposition was a discovery deposition rather than an “evidence deposition” and that the “best evidence” was Martello’s accident report, which the parties had jointly offered as an exhibit. Defense counsel further argued that Mar-tello did “recall the motorcycle” and was “here live,” although acknowledging that “his memory here is not good.”[2] The trial *99 court sustained the defense’s objection to the introduction of Martello’s previous deposition. Plaintiffs’ counsel then proffered the deposition.
| (¡Thereafter, when Martello continued to exhibit difficulty with recalling his prior testimony and opinions, plaintiffs’ counsel sought to use Martello’s deposition to refresh his memory on this issue. However, defense counsel objected on the basis that Martello did not recall giving his deposition testimony, and the trial court sustained the objection. When plaintiffs’ counsel then asked the court if he would be allowed to use the deposition testimony to impeach Martello, the court responded, “If he doesn’t recall giving it, how can you impeach him?”[3]
Plaintiffs assert that because of these erroneous rulings, they were improperly put in a predicament in that they could not introduce Martello’s earlier sworn testimony because the trial court refused to find Martello to be “unavailable” due to memory deficits, but, nonetheless, they also were not allowed, due to Martello’s inability to recall giving his deposition, to refresh his memory or impeach him with excerpts from that prior testimony if Martello said anything contradictory to that prior testimony at trial. On review, we agree.
Louisiana Code of Civil Procedure article 1450 establishes the parameters for the use of deposition testimony at trial[4] and provides in pertinent part as follows:
|7A. At the trial ..., any part or all of a deposition, so far as admissible under the Louisiana Code of Evidence applied as though the witnesses were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
(1) Any deposition may be used by any party for the pin-pose of contradicting or impeaching the testimony of deponent as a witness.
[[Image here]]
(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: (a) That the witness is unavailable....
Article 804(A) of the Louisiana Code of Evidence defines unavailability, in pertinent part, as follows:
Except as otherwise provided by this Code, a declarant is “unavailable as a witness” when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. This includes situations in which the declarant:
[[Image here]]
*100 (3) Testifies to a lack of memory of the subject matter of his statement^]
The trial court has much discretion in determining whether to allow the use of deposition testimony at trial, and its decision will not be disturbed upon review in the absence of an abuse of that discretion. State, Department of Social Services Support Enforcement Services in the Interest of Bordelon v. Guichard, 94-1795 (La.App. 1st Cir.5/5/95), 655 So.2d 1871, 1378, writ denied, 95-1405 (La.9/15/95), 660 So.2d 454.
As detailed above, because of his medical condition at the time of trial, Mar-tello recalled only the motorcycle, but no other facts or circumstances surrounding his investigation of this accident or preparation of the accident report. Thus, Mar-tello clearly met the definition of an unavailable witness as described by LSA-C.E. art. 804(A)(3). See Hukill v. State, DOTD, 2004-1009 (La.App. 3rd Cir.12/13/04), 896 So.2d 82, 88-90 ^(Investigating officer who had no independent recollection of the events which led to the accident in question was clearly unavailable pursuant to LSA-C.E. art. 804(A)(3)).
In a factually similar case involving mental deficits, subsequent to the events giving rise to the suit, a deputy marshal (who was a named defendant) suffered a head injury, which led to seizures and resulted in the deputy marshal missing two months of work. Subsequently, after giving his deposition in the matter, the deputy marshal was involved in a motor vehicle accident, leading to a recurrence of the seizures and eventually to a diagnosis of dementia. The United States Eleventh Circuit Court of Appeals affirmed the district court’s finding that the deputy marshal was “unavailable” pursuant to Federal Rule of Evidence 804(B)(1) and concluded that the district court had not abused its discretion in admitting the deputy marshal’s deposition in lieu of his testimony at trial.[5] Parrott v. Wilson, 707 F.2d 1262, 1268-1269 (11th Cir.), cert. denied, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983).
Moreover, despite Martello’s testimony that he remembered “the motorcycle,” his lack of memory as to a material portion of the circumstances surrounding his investigation and as to the subject matter of his prior testimony rendered him unavailable, such that his former deposition testimony was admissible. See United States v. Amaya, 533 F.2d 188, 191 (5th Cir.1976), cert. denied, 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977) (quoting McDonnell v. United States, 472 F.2d 1153, 1155 (8th Cir.), cert. denied, 412 U.S. 942, 93 S.Ct. 2785, 37 L.Ed.2d 402 (1973)).
Similarly, with regard to the trial court’s refusal to allow plaintiffs to use Martello’s deposition to refresh his recollection or to impeach him, in a civil case, any writing, recording, or object may be used by a witness to refresh his memory while testifying. LSA-C.E. art. 612(A); Campbell v. Hospital Service District No. 1 Caldwell Parish, 37,876 (La.App. 2nd Cir.12/10/03), 862 So.2d 338, 346, writ denied, 2004-0069 (La.3/19/04), 869 So.2d 852. Also, as quoted above, LSA-C.C.P. *101 art. 1450(A)(1) provides that any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of a deponent as a witness. Simms v. Progressive Insurance Company, 38,804 (La.App. 2nd Cir.9/29/04), 888 So.2d 473, 481-482. If indeed, as implicitly found by the trial court, Martello was not “unavailable” due to memory loss, then plaintiffs should have been allowed to refresh his recollection or impeach him with his prior deposition testimony.
Considering the foregoing, and based upon our review of Martello’s trial testimo: ny, we are constrained to conclude that the trial court erred in refusing to declare Martello “unavailable” within the meaning of LSA-C.E. art. 804(A)(3) and, thus, in refusing to allow the introduction of his prior deposition testimony pursuant to LSA-C.C.P. art. 1450(A)(3)(a), while also refusing to allow use of his prior deposition testimony to either refresh his recollection or impeach him. The combined result of these rulings effectively served to negate Martello’s prior testimony given at a time when he was not afflicted with memory loss.
If the exclusion of evidence taints a trial court’s findings, this court steps into the shoes of the factfinder and conducts a de novo review of all the | inadmissible evidence to ensure a fair trial and a fair judgment. Nonetheless, a de novo review should not be undertaken for every eviden-tiary exclusion error. Rather, a de novo review should be limited to consequential errors; that is, the error prejudiced or tainted the trial court’s finding with regard to a material factual issue. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735; Wingfield v. State Department of Transportation and Development, 2001-2668 (La.App. 1st Cir.11/8/02), 835 So.2d 785, 799, writs denied, 2003-0313, 2003-0339, 2003-0349 (La.5/30/03), 845 So.2d 1059-1060, cert. denied, 540 U.S. 950, 124 S.Ct. 419, 157 L.Ed.2d 282 (2003).
In some cases, a preliminary de novo review can be limited to a determination of the impact of the excluded evidence on the overall findings. If it is clear from the initial limited de novo review that the excluded evidence could not have permissibly changed the ultimate findings of the trier of fact, the judgment should not be vacated and reviewed de novo. In the absence of a tainted fact-finding process, the trial court’s ultimate findings are subject only to a manifest error review. See Wingfield, 835 So.2d at 799. Such is the case before us on the issue of the excluded deposition testimony of Martello and its possible consequences.
Our review of Martello’s proffered deposition testimony as well as his trial testimony reveals that, despite strenuous efforts by defense counsel to limit Martel-lo’s trial testimony to only those facts and details contained in the accident report and despite Martello’s memory deficits, plaintiffs’ counsel was able to elicit testimony from Martello at trial, as he had in the excluded deposition, acknowledging certain errors in the accident report. Moreover, Martello candidly stated in his deposition that the vehicles had been moved prior to his arrival and that he was unable to find any yaw)ninarks or a debris trail when he arrived at the scene. Thus, he was unable to independently determine where, in relation to which lane, the point of impact occurred. He was also unable to determine the speed at which Daniel was traveling upon impact.
Accordingly, considering the foregoing and based upon our initial de novo review of Martello’s excluded deposition testimony, we conclude that the legal error by the trial court in excluding the deposition did not materially affect the outcome herein. *102 A de novo review of the trial court’s ultimate findings is, thus, not warranted. See Wingfield, 835 So.2d at 800.
Directed Verdict on “No Pay/No Play” (Assignment of Error No. 3)
In this assignment of error, plaintiffs contend that the trial court erred in granting defense counsel’s motion for directed verdict on the issue of “No Pay/No Play” and rendering judgment granting defendants a $10,000.00 credit against any damages sustained by Daniel. We agree.
At the close of plaintiffs’ case, defense counsel moved for a directed verdict on the issue of “No Pay/No Play,” asserting that plaintiffs had failed to prove that they had valid insurance coverage at the time of the accident.[6] Defense counsel argued that defendants had requested information about plaintiffs’ insurance coverage in discovery, but that plaintiffs had failed to provide them with that information. Thus, defense counsel asserted that defendants were entitled to a $10,000.00 credit toward any damages awarded. The court granted the motion for directed verdict on this issue and |12ultimately included a provision in its judgment on the merits granting defendants a $10,000.00 credit against any damages sustained by Daniel.
Louisiana Code of Civil Procedure articles 1469 through 1474 govern the procedures for compelling discovery. Pursuant to LSA-C.C.P. art. 1469, if a party fails to respond to discovery initiated by another party, the remedy available to the party who propounded the discovery is to move the court for an order compelling such discovery. If such an order is granted, the recalcitrant party may be ordered to pay reasonable expenses incurred in obtaining the order. LSA-C.C.P. art. 1469(A)(4); MTU of North America, Inc. v. Raven Marine, Inc., 475 So.2d 1063, 1070 (La.1985).
If the court grants an order compelling discovery pursuant to LSA-C.C.P. art. 1469, and that order is subsequently disobeyed, LSA-C.C.P. art. 1471 authorizes the court to impose such sanctions as are just, including: to establish facts as proven for purposes of the litigation; to exclude claims or defenses; to strike the pleadings; to dismiss the action; or to enter a default judgment. MTU of North America, Inc., 475 So.2d at 1070; Helm v. Mervyn’s Department Store, 97-0547 (La. App. 4th Cir.8/20/97), 699 So.2d 129, 131.
Thus, there is a distinction between the sanctions available for a failure to comply with party-initiated discovery and for a failure to comply with a court order to provide or permit discovery. Generally, when the party fails to comply with party-initiated discovery, he may be required only to pay the reasonable expenses of obtaining an order compelling discovery. However, when a party fails to obey an order to provide or permit discovery, he is susceptible to the serious sanctions listed discussed above. LSA-C.C.P. arts. 1469 & 1471; MTU of North America, Inc., 475 So.2d at 1070. “These rules, in effect, offer a built-in second chance for most recalcitrant parties to comply with discovery and pay motion costs and fees before ^becoming amenable to the more severe sanctions associated with a disobe- *103 dienee of court-ordered discovery.” MTU of North America, Inc., 475 So.2d at 1070.
Moreover, such a proceeding to impose sanctions for failure to comply with a discovery order should be instituted by written contradictory motion and requires reasonable notice. LSA-C.C.P. arts. 961-963; Wall v. Alleman, 488 So.2d 1130, 1132 (La.App. 2nd Cir.1986). Moreover, a party failing to seek an order compelling discovery prior to trial waives or abandons any objection at trial on this issue. A party cannot seek the remedies provided in LSA-C.C.P. arts. 1469 through 1471 for the first time at trial. Wall, 488 So.2d at 1132.
In the instant ease, the record is devoid of any motion filed by defendants to compel plaintiffs to respond to their discovery requests. Thus, absent an order compelling production of plaintiffs’ automobile liability policy, there was no basis for the trial court to consider the fact of uninsured status to be established as proven for purposes of the litigation and, thus, to grant a $10,000.00 credit toward any recovery by Daniel.[7] See Helm, 699 So.2d at 131. This portion of the judgment will, accordingly, be reversed.
Speculative Testimony by Vargas (Assignment of Error No. 4)
In this assignment of error, plaintiffs contend that the trial court erred when it allowed defendant Vargas to give speculative testimony, contrary to |ULSA-C.E. art. 701, as to where the motorcycle was prior to impact, where Vargas had testified that she never saw the motorcycle prior to impact.
Generally, a lay witness may not give testimony in the form of opinions or inferences. This rule is subject to the limited exception of LSA-C.E. art. 701, which provides that if a witness is not testifying as an expert, her testimony in the form of opinions or inferences must be: (1) rationally based on the witness’s perception, and (2) helpful to a clear understanding of her testimony or the determination of a fact in issue. Thus, a lay witness may give opinion testimony based on her training, investigation, perception of the scene, and observation of physical evidence. Rideau v. State Farm Mutual Automobile Insurance Company, 2006-0894 (La.App. 1st Cir.8/29/07), 970 So.2d 564, 572, writ denied, 2007-2228 (La.1/11/08), 972 So.2d 1168.
In support of this assignment of error, plaintiffs reference the portion of the trial transcript where Vargas was questioned about how the accident occurred. Defense counsel asked Vargas if, in her opinion, it was possible for the Walleys “to have gotten in the position in front of [her] truck legally.” At that point, plaintiffs’ counsel objected to the question on the basis that Vargas had testified that she never saw the motorcycle prior to impact and, thus, could not testify as to where it had traveled before she hit it. The trial court initially ruled that it would allow the response. However, when the question was then read back by the court reporter, plaintiffs’ counsel again objected, and the *104 trial court sustained the objection. Thus, the portion of the questioning referenced by plaintiffs on appeal reveals that, in fact, the trial court sustained their objection and did not allow the opinion testimony that defense counsel sought to elicit.
| ^Moreover, when defense counsel attempted later in the questioning to elicit the same opinion testimony from Vargas, the trial court again sustained plaintiffs’ counsel’s objection. Accordingly, based upon our review of the record, we find no merit to this assignment of error.
Hearsay Statements (Assignment of Error No. 5)
In this assignment of error, plaintiffs contend that the trial court erred in allowing hearsay statements by Stephanie Metrejean, a witness to the accident, to be introduced at trial despite her absence when she was available as a witness. The statement of which plaintiffs complain is the written statement Metrejean provided to Officer Martello, which was made a part of the accident report.
However, we note at the outset that the entirety of the accident report was introduced by plaintiffs’ counsel as a joint exhibit. Moreover, in introducing the accident report into evidence, plaintiffs did not request that that the witness narratives included in the accident report be removed or that the exhibit be restricted in its admissibility to exclude any hearsay statements contained therein. Upon request, the court shall restrict evidence admitted to its proper scope. However, absent a request to do so, failure to restrict the evidence shall not constitute error. LSA-C.E. art. 105. Moreover, failure to object to hearsay evidence when admitted at trial constitutes a waiver of the right to object to its admissibility, and such evidence may be considered and given probative effect. McDaniel v. DeJean, 556 So.2d 1336, 1338 (LaApp. 3rd Cir.1990).
Accordingly, because plaintiffs introduced the accident report into evidence without seeking a ruling from the trial court limiting its admissibility or striking inadmissible portions, plaintiffs cannot later | ^complain about the unrestricted use of that evidence at trial. See Hollenbeck v. Oceaneering International, Inc., 96-0377 (La.App. 1st Cir.11/8/96), 685 So.2d 163, 177, writ denied, 97-0493 (La.4/4/97, 692 So.2d 421), and Richard v. Southwest Louisiana Hospital Association, 383 So.2d 83, 86 (La.App. 3rd Cir.), writ refused,, 385 So.2d 274 (La.1980). This assignment of error also lacks merit.[8]
*105 Fault of Vargas (Assignments of Error Nos. 6 and 7)
In their sixth assignment of error, plaintiffs contend that the trial court erred in failing to place the burden on defendant Vargas to disprove her liability pursuant to LSA-R.S. 32:122 and LSA-R.S. 32:124, when she was making a left turn out of a private drive that resulted in the accident. And in their final assignment of error, plaintiffs contend that the trial court erred in finding Vargas without fault where her testimony included multiple inconsistencies, she testified that she was looking in the opposite direction of oncoming traffic, and she failed to carry her statutory burden of proof.
Louisiana Revised Statute 32:124 provides that the driver of a vehicle about to enter or cross a highway from a private road, driveway, alley or [17building, shall yield the right of way to all approaching vehicles so close as to constitute an immediate hazard. The driver entering a highway has the primary duty to avoid a collision. Unusual, extreme, and high care toward favored traffic is required of such a motorist under the case law. James v. DHL Express (USA), Inc., 2010-0581, p. 6 (LaApp. 1st Cir.10/29/10), 2010 WL 4272998 (unpublished); Wells v. Allstate Insurance Company, 510 So.2d 763, 767 (La.App. 1st Cir.), writ denied, 514 So.2d 463 (La.1987); Griffin v. City of Monroe, 46,229 (La.App. 2nd Cir.4/13/11), 61 So.3d 846, 850; Daniel v. Burridge, 2000-1089 (LaApp. 4th Cir.3/21/01), 785 So.2d 906, 910, unit denied, 2001-1110 (La.6/1/01), 793 So.2d 201; Corvers v. Acme Truck Lines, 95-925 (LaApp. 5th Cir.4/16/96), 673 So.2d 1088, 1090; Migues v. Hebert, 93-1509 (La.App. 3rd Cir.6/1/94), 640 So.2d 670, 672.
Conversely, the duty of the driver on the favored street toward the intruding motorist is the much-lesser ordinary care, and that driver generally may rely on the assumption or presumption that those vehicles entering the roadway from less-favored positions such as a private drive will not drive into the path of favored traffic. James, 2010-0581 at p. 6; Corvers, 673 So.2d at 1090; Migues, 640 So.2d at 672.
Nevertheless, even a favored driver can still be found negligent if his substandard conduct contributed to the cause of the accident. Hebert v. Old Republic Insurance Company, 01-355 (La.App. 5th Cir.1/29/02), 807 So.2d 1114, 1125; Corvers, 673 So.2d at 1090. Thus, the presumption that vehicles entering the roadway will not drive into the path of favored traffic may not be relied on by a motorist who is proceeding unlawfully before or after he sees the intruding vehicle. Battaglia v. Texas Farmers Insurance Company, 98-2607 (La.App. 4th Cir.3/31/99), 732 So.2d 119, 121, writ denied, 99-1579 (La.9/17/99), 747 So.2d 564; Corvers, 673 So.2d at 1090; Migues, 640 So.2d at 672. The burden of proving that substandard conduct, such as speed, caused or contributed to the accident is on the driver intruding into the favored street in violation of LSA-R.S. 32:124. James, 2010-0581 at p. 6; Battaglia, 732 So.2d at 122; Corvers, 673 So.2d at 1090.
With regard to plaintiffs’ contention in their sixth assignment of error that the trial court erred in failing to place the burden on Vargas to disprove her liability, we note that the trial court did not provide written reasons for judgment. Thus, on the record before us, we cannot determine that the trial court committed legal error in its application of the burden of proof herein. Accordingly, we will review the trial court’s findings of fault, which plaintiffs challenge in their final assignment of error, under the traditional manifest error standard of review.
*106 In the instant case, the accident occurred on Rushing Road to the east of the intersection of Rushing Road and Range Avenue. To the east of this intersection, Rushing Road is a two-lane highway, with one eastbound and one westbound travel lane. However, as westbound traffic approaches the intersection with Range Avenue, a left-turn lane forms for westbound traffic on Rushing Road to turn left onto Range Avenue. Thus, Rushing Road becomes a three-lane highway prior to the intersection.
Also to the east of the intersection, there are two private drives located on the north side of Rushing Road which furnish ingress and egress to and from a shopping center parking lot. Vargas was attempting to exit the private drive closest to the intersection of Rushing Road and Range Avenue and to turn left onto Rushing Road when the accident occurred.
Undisputedly, Vargas was engaged in two high-risk maneuvers: exiting the parking lot of a strip shopping center by means of a private driveway to enter a favored roadway and attempting to make a left-hand turn h3onto that favored roadway.[9] Vargas, as the driver entering the favored street, owed a higher duty to avoid an accident than did Daniel, who had the legal right-of-way. See Battaglia, 732 So.2d at 121-122; Corvers, 673 So.2d at 1090. As such, Vargas also had the burden of proving that Daniel’s substandard conduct caused or contributed to the accident.
To establish this burden of proof at trial, defendants contended that Daniel Walley was speeding; crossed the double-yellow, center dividing line into the oncoming, eastbound traffic lane and passed stationary cars in the westbound lane; and unlawfully entered the left-turn lane in the yellow lined area where the left-turn lane was beginning to form, but not yet fully formed, all of which caused the accident herein.
According to the accident report, the accident occurred one hundred feet east of the intersection of Rushing Road and Range Avenue. However, the testimony and evidence at trial as to the exact configuration of the roadway where the accident occurred and as to the circumstances surrounding the accident was conflicting. Unfortunately, the record does not contain any photographs of the scene taken at the time of the accident, and because the vehicles had been moved prior to the Martel-lo’s arrival, he did not draw a diagram of the accident scene demonstrating the location of the vehicles or configuration of the roadway at the point of the collision. Thus, the trial court had to weigh the conflicting accounts of the parties and witnesses in its determination of fault herein.
As stated above, Daniel Walley was operating his Harley Davidson motorcycle, with his wife Alisa as a passenger, traveling westbound on Rushing Road, approaching the intersection of Rushing Road and Range |20Avenue. Daniel testified at trial that at the point where the accident occurred, Rushing Road had two westbound lanes of travel and one eastbound lane. According to Daniel, the right, outermost westbound lane was designated for traffic proceeding straight through the intersection or turning right at the intersection, while the inside westbound land was designated as a left-turn-only lane. Daniel further testified that there was a lot of congestion and traffic “backed up” in the immediate area of the accident, with “bumper to bumper” traffic *107 in the right, outermost westbound lane on Rushing as the traffic waited for a green light. However, according to Daniel, the left-turn-only lane had “no cars whatsoever.”
At the point where Daniel first encountered the bumper-to-bumper traffic, Rushing Road was only two lanes, with the left-turn-only lane not having yet formed. However, according to Daniel, as traffic began to move closer to the intersection, the left-turn lane began to form, and eventually he was able to access that lane. As soon as there was space available, he then proceeded into the left-turn lane with the intent of turning left onto Range Avenue. Daniel estimated that he traveled 220 to 230 feet in the left-turn lane and passed seven to nine stationary vehicles occupying the right, outermost lane of westbound traffic after he entered the inside, left-turn lane and that the maximum speed he attained upon entering the left-turn lane was ten miles per hour.
As he was proceeding westbound in the left-turn lane, Daniel noticed a gap between two vehicles in the right, outermost lane, and, as he approached, he then saw Vargas’s vehicle proceeding from a private driveway through the gap as if to make a left turn into the eastbound lane of travel on Rushing Road. According to Daniel, at that point, he began to decelerate and apply his brakes, and he instinctively tried to make eye |⅞1 contact with Vargas. However, he could not do so because she was looking to her right, in a westerly direction, as she began to turn eastbound on Rushing Road. She continued to look in the opposite direction without ever turning to look to her left, as she attempted to cross the left-turn lane of Rushing Road. The center front grill on Vargas’s vehicle then struck the middle, right-hand side of Daniel’s motorcycle in the left-turn lane.
According to Daniel, he entered the left-turn lane only when it was permissible, according to highway markings, for him to enter the turn lane. He denied that he ever crossed the center dividing line of Rushing Road or ever pulled into the eastbound lane to proceed in a westerly direction. Daniel further denied that he ever traveled over any pavement markings, such as hash marks, coping or neutral ground to access the turn lane.
Alisa Walley similarly testified that Daniel had entered the left-turn lane only after that lane formed and that she did not observe Daniel cross the double yellow lines on Rushing Road at any time prior to the collision. Alisa became aware that Daniel was braking and slowing down in the seconds before impact. With regard to Vargas’s actions prior to the collision, Alisa testified that she did not recall seeing the gap in traffic in the right, outermost lane of westbound traffic on Rushing Road and that she saw only a “flash” of Vargas’s vehicle almost at the point of impact.[10] Nonetheless, she testified that prior to impact, she saw that Vargas was looking to her right and never looked forward in the direction in which she was traveling. Thus, Vargas did not make eye contact with them, and, according to Alisa, it was obvious that Vargas had not seen them.
_J_2gAlisa further testified that as a result of the impact, she “bounced off’ the motorcycle into the oncoming eastbound lane of traffic on Rushing Road. However, after the collision, she ran over to the bike to check on Daniel, and, according to Alisa, the motorcycle had fallen in the middle of *108 the left-turn lane that they had been occupying.
However, Vargas’s account of the events leading up to the accident differs from those of the Walleys. Vargas testified that as she was attempting to make a left turn onto Rushing Road from the driveway of a strip mall, the traffic in the westbound lane of Rushing Road was stopped due to a red traffic light at the intersection of Rushing Road and Range Avenue. However, one motorist had stopped and left her a space to pull out and had then “waved” Vargas out.[11] Thus, after coming to a complete stop in the driveway of the strip mall, Vargas “inched out,” looked to her left, inched out a little more, and then looked to her right. When she saw that traffic was clear to her right, Vargas took her foot off the brake and “just started, you know, just kept going,” and that was when the impact occurred.
Vargas acknowledged that at the time of impact, she was looking to her right and, thus, was not looking in her direction of travel. She did not turn back to look to the left again before beginning to execute her left-hand turn. In explaining why she did not look back in her direction of travel before proceeding forward, Vargas first stated that at the point where she exited the strip mall driveway and attempted to turn left onto Rushing Road, Rushing Road did not have three complete lanes. Rather, the area had was only two complete lanes (apparently meaning a westbound and an eastbound l^lane), and the middle, left-turn lane had just begun to form. She further explained that the roadway at the point beside the vehicle that had motioned her out had “like a yellow thing, and it has lines through it” that was “not supposed to be [driven] through,” which is why she “felt like it was clear.” Thus, according to Vargas, traffic in the westbound lane was stopped and backed up behind the vehicle that motioned her out, and vehicles could not have possibly gotten into the left-turn lane because “there’s no lane for [vehicles] to be coming so there were no cars.” Accordingly, Vargas stated that “there was no reason” to look back to the left in her direction of travel.
On cross-examination, however, Vargas acknowledged that in her earlier deposition testimony, she had testified that at the point where she entered Rushing Road from the strip mall driveway, there were three fully formed lanes, one eastbound lane and two westbound lanes. She further acknowledged that her testimony was probably more accurate at the time of her deposition than at the time of trial. Thus, on cross-examination, she agreed that at the point where she was attempting to cross the westbound lanes of Rushing Road to turn east, the left-turn lane was in fact fully formed.
Vargas also contended at trial that the impact between her vehicle and Daniel’s motorcycle occurred in the outermost westbound lane of Rushing Road where the traffic was at a standstill, and not in the westbound, left-turn lane. She then stated that she thought the impact occurred “right before the lane went to the next lane ... maybe in between the two lanes, like the line,” stating that she “wasn’t in the turning lane.” However, Vargas then acknowledged at trial that in her earlier deposition testimony, she had admitted that she had begun to cross the westbound turning lane at the point where *109 the impact occurred. Also, Vargas again acknowledged at that point 124that her deposition testimony would probably be more accurate than her trial testimony.
Nonetheless, Vargas then explained that while there may have been three lanes where she entered and attempted to cross Rushing Road, traffic was built up and stopped in the outermost westbound lane past the point of the yellow, lined area where the left-turn lane was beginning to form and through which a motorist was not supposed to travel. Thus, because traffic was at a standstill beyond the point where the left-turn lane began to form, she did not look to the left again to “clear it again” once observing that no vehicles could enter the left-turn lane due to the line of traffic at a standstill. Vargas further testified that she did not recall seeing a motorcycle in the line of stopped vehicles in the outermost westbound lane.
Bruce Ruckstuhl also testified at trial as to what he witnessed that day. Ruckstuhl was a passenger in a Ford van driven by his wife. At the time of the accident, they were waiting to exit the strip mall parking lot onto Rushing Road from the second parking lot exit, the one farther away from the intersection of Rushing Road and Range Avenue.[12] According to Ruckstuhl, the area of Rushing Road directly in front of this second exit from the parking lot was divided by solid, double yellow, or no passing, lines, and to the right (or west) of that parking lot exit, there was an area of diagonal lines where the left-turn lane began to form. At that time, the westbound lane of travel headed toward the intersection with Range Avenue was occupied, and the vehicles in that lane were stopped.
12SRuckstuhl testified that as he and his wife were waiting to exit the mall parking lot onto Rushing Road, he saw a motorcycle traveling westbound on the opposite side of the double yellow lines, in the eastbound lane of travel, passing stationary vehicles in the westbound travel lane at a speed of “at least” thirty miles per hour and accelerating.[13] Although Ruck-stuhl did not see the collision, he testified that he heard the collision “a couple of seconds” after he saw the motorcycle drive past him. When asked if he considered the motorcycle to be performing a dangerous maneuver, Ruckstuhl responded, “absolutely.”
Eventually, Ruckstuhl and his wife proceeded onto Rushing Road and passed the scene of the accident. Based on his observation of the scene, Ruckstuhl indicated that it appeared that the motorcycle made it to the left-turn lane and had “wound up” in that turn lane, meaning that the motorcycle had traveled far enough west where the turn lane was formed. Thus, at the point of the collision, Rushing Road was three lanes wide. However, Ruckstuhl did not recall the motorcycle having come to rest in the left-turn lane. Rather, he recalled seeing the motorcycle lying in the eastbound lane of travel. He further recalled that Vargas’s truck was straddling the westbound turn lane when he observed the accident site. However, Ruckstuhl acknowledged that he could not say in which lane the impact occurred because he did not witness the accident.
*110 The testimony of Steve Tregre, who witnessed the actual collision, was also presented at trial through his previous deposition.[14] Tregre, who was driving a Jeep Cherokee, testified in deposition that on the day of the | ¡^accident, he was stopped in traffic heading westbound on Rushing Road and had left a space in front of him for traffic to enter and exit the mall parking lot at issue. According to Tregre, Vargas approached Rushing Road from the mall parking lot and stopped. He recalled that she was hesitant to pull out, but that she then started to slowly pull onto the roadway. Tregre further related that after Vargas pulled out in front of him, he saw her look both ways and then begin to make a left-hand turn into the opposing lane of Rushing Road. He testified that as soon as Vargas started to make the turn, “a motorcycle appeared,” and the front bumper of Vargas’s vehicle struck the right side of the motorcycle. Tregre described the actual impact as a “tap,” which caused the motorcycle to fall over.
Because he did not see the motorcycle until the accident occurred, Tregre stated that he did not know how fast it had been traveling. However, he noted that the motorcycle “just fell over” upon impact, and he assumed that if it had been traveling faster, it would have slid after impact.
With regard to the configuration of the roadway at the location, Tregre did not recall whether the left-turn lane was fully formed into a full lane width at the point where the impact occurred or if it had even begun to form at that point. However, Tregre testified that the impact did not occur in his lane of travel, but instead, occurred “on the side of [him].” Tregre agreed that at the time of impact, the motorcycle was only a few feet to the left of him. However, because he could not recall whether there was a turn lane beside him, he could not say whether the motorcycle was in the oncoming, eastbound lane of travel or whether it was in the left-turn lane.
On the other hand, Gwendolyn Bush, who was also stopped in the westbound lane of travel on Rushing Road, testified at trial as to her perception of the lane that the motorcycle occupied. Bush had been ^following Tregre that evening, but because of traffic, Bush was “a couple of vehicles” behind Tregre at the time of the accident.[15] Thus, her vehicle was the third or fourth vehicle behind the driveway where Vargas exited the mall parking lot.
According to Bush, Rushing Road had only one westbound lane at the point where she was stopped, but the turn lane was beginning to form at that location.[16] Bush stated that she first became aware of the motorcycle when it fell and that, at the point where it fell, the left-turn lane was a full lane, with the motorcycle occupying that lane. Bush recalled that the motorcycle tipped over to the right, toward the truck that struck it.[17]
*111 With regard to the path of the motorcycle prior to impact, Bush’s testimony indicated that she was unaware of its path prior to it tipping over. Bush did not recall seeing the motorcycle pass her or cross the center line of Rushing Road. However, she also did not recall seeing a motorcycle positioned between her and Tregre in her lane of travel prior to the accident.[18]
The written narrative of Metrejean, which was introduced as part of the accident report, was also discussed at trial. In her statement, Metrejean indicated that she was stopped in the left lane of Rushing Road “going to Florida Blv. ... bringing [her] child skating” when a woman in a truck (who the record demonstrates was Vargas) was entering Rushing Road from the mall parking lot. According to Metre-jean, “both lanes” to Vargas’s left were |Mat a stop as she pulled onto Rushing, but the motorcycle then “came flying” past her, crossing the yellow lines to go around “us.” Metrejean related that “the guy on the bike wipped [sic] in” and “was getting back in the lane he should have waited in” as Vargas was “cheeking to make sure she had it to her right.” Metrejean further indicated that Vargas then “slowly started the rest of her way out” when she suddenly stopped and her truck “bumped” the motorcycle.
At trial, Officer Martello acknowledged that he indicated in his accident report that the Walley motorcycle was guilty of a violation for cutting in and improper passing, findings supported by Metrejean’s narrative. However, with regard to Me-trejean’s statement that she was in the left lane of Rushing Road at the time of the accident, Martello acknowledged at trial that Metrejean had also indicated in her narrative that she was going to Florida Boulevard. Martello stated that to reach Florida Boulevard, a motorist would turn right onto Range Avenue, not left. Thus, Martello admitted he saw an inconsistency in Metrejean’s statement.[19]
Moreover, with regard to the violations listed in the accident report, Martello testified that his report should have also reflected a violation for Vargas for “failure to yield.”
A review of the record, as highlighted above, demonstrates that, while the overall evidence reveals the basics of the accident, the trial court was confronted with conflicting and sometimes internally inconsistent testimony as to the specific events surrounding this accident. Nonetheless, the general scenario herein is factually similar to the situation presented in Howell v. State Farm Mutual Automobile Insurance Company, 577 So.2d 344, 345-346 (La.App. 1st Cir.1991). In Howell the plaintiff was attempting to make a left turn onto the favored roadway from a private drive, which was approximately eighty feet west of an intersection. At that point, the favored roadway consisted of two lanes, with the beginning of a left-turn lane for vehicles wanting to turn left at the approaching intersection. The turn lane was preceded for a short distance by a “barrier lane” marked with yellow stripes to warn vehicles of the developing turn lane. Thus, in order to execute his left turn onto the westbound lane of the fa *112 vored roadway, the plaintiff had to cross the eastbound lane and a portion of the barrier lane. Howell, 577 So.2d at 845.
Traffic was backed up in the eastbound lane of travel closest to the private drive. However, as the plaintiff was attempting to make his left-turn maneuver, a driver in the eastbound lane left a gap between his vehicle and the vehicle ahead of him and motioned the plaintiff to cross. After ascertaining that the westbound lane was clear, the plaintiff proceeded to cross. Howell, 577 So.2d at 345.
However, when the plaintiff reached the barrier lane, he collided with a vehicle whose driver had proceeded to pass a car or cars in front of her to get to the left-turn lane. To accomplish this, the driver on the favored roadway had crossed the double-yellow, no-passing line and entered the prohibited barrier lane. Howell 577 So.2d at 345-346.
Although recognizing the statutory duty of care owed by the vehicle entering the favored roadway from a private drive as set forth in LSA-R.S. 32:124, this court nonetheless concluded that the trial court had not erred in finding that the eastbound motorist on the favored street who unlawfully left |snthe eastbound lane in an attempt to reach the left-turn lane to be 100% at fault in causing the accident. Howell, 577 So.2d at 346.
Turning to the instant case, while questions were raised as to the lane in which Metrejean was actually situated, her statement that Daniel Walley crossed the double-yellow, center line into the oncoming lane of travel in order to access the left-turn lane was supported by the testimony of Ruckstuhl, who also observed Daniel cross the double-yellow, center line. Thus, the trial court could have chosen to credit the statements of Metrejean and Ruck-stuhl over those of plaintiffs on this issue.
Moreover, while Vargas’s testimony was certainly inconsistent at times, her claim that westbound traffic was stationary past the yellow, line area where the left-turn lane began to form when she attempted her left turn was supported by Ruckstuhl’s similar testimony that traffic was at a standstill beyond the point on the roadway where the diagonal lines marked the beginning of the formation of the left-turn lane. This testimony, together with Ruck-stuhl’s statement that Daniel had crossed the double-yellow lines into the eastbound lane of travel to pass stationary westbound vehicles at a point on the roadway east of the diagonal yellow lines, supports a factual finding that Daniel accessed the left-turn lane by an illegal maneuver of either crossing the double-yellow, center line and/or traveling through the area of the roadway marked with diagonal lines where the turn lane began to form. See LSA-R.S. 32:77 (no driver shall at any time drive on the left side of a roadway within a zone marked as a no-passing zone or on the left side of any pavement striping designated to mark a no-passing zone); Howell, 577 So.2d at 346. Additionally, Vargas’s testimony that she was proceeding slowly with care was supported by the testimony of Tregre and Metrejean and, thus, supports a finding that she exercised extreme and high care.
|s1As the trier of fact, the trial court was free to accept, in whole or in part, the testimony of any witness. Succession of Wagner, 2008-0212 (La.App. 1st Cir.8/8/08), 993 So.2d 709, 722. When factual findings are determinations regarding credibility of witnesses, the manifest error standard demands that great deference be accorded to the trier of fact’s findings. Succession of Wagner, 993 So.2d at 722. Moreover, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erro *113 neous. Huddleston v. Ronald Adams Contractor, Inc., 95-0987 (La.App. 1st Cir.2/28/96), 671 So.2d 583, 536.
Thus, if the trial court concluded that Daniel had unlawfully crossed the center line and then traversed the area marked by diagonal stripes to gain access to the left-turn lane, then plaintiffs could not rely upon the presumption that drivers enjoy when they proceed lawfully on a favored street. See Hannie v. Guidry, 2010-216 (La.App. 3rd Cir.10/6/10), 48 So.3d 396, 403-404. Considering the foregoing, even if we would have decided the case differently if sitting as the trier of fact, we are unable to conclude that the trial court committed manifest error in assessing 100% fault to Daniel Walley in causing this accident. Hannie, 48 So.3d at 403-404. Accordingly, this assignment of error also lacks merit.
CONCLUSION
For the above and foregoing reasons, the portion of the trial court’s October 6, 2011 judgment ordering that defendants receive a $10,000.00 credit for any damages sustained by plaintiff Daniel Walley is reversed. In all other respects, the judgment is affirmed. Costs of this appeal are assessed one-half to Daniel and Alisa Wal-ley and one-half to Regina Vargas and American Family Mutual Insurance Company.
AFFIRMED IN PART; AND REVERSED IN PART.

. By amended petition, plaintiffs also named as defendant American International South Insurance Company as Vargas’s insurer. However, on plaintiffs' motion, judgment was later rendered dismissing plaintiffs' claims against this defendant.

. Defense counsel also argued that Martello may have had other strokes prior to his deposition or that his previous gunshot injuries could have resulted in memory loss before Martello gave his deposition testimony. However, a cursory review of the proffered *99 deposition testimony reveals that Martello had no memory deficits resulting from his gunshot wounds at that time.

. The court also denied a subsequent, second request to use Martello's deposition testimony to refresh his recollection.

. Louisiana Code of Evidence article 804(B), cited by plaintiffs, similarly provides, in pertinent part, as follows:
The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered, or, in a civil proceeding, a party with a similar interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. Testimony given in another proceeding by an expert witness in the form of opinions or inferences, however, is not admissible under this exception.

. The Louisiana rules of evidence are largely modeled after the provisions of the Federal Rules of Evidence of 1975, and LSA-C.E. art. 804(a) generally follows Federal Rule of Evidence 804(a). See LSA-C.E. art. 101, 1988 Official Comment (a) and LSA-C.E. art. 804, 1988 Official Comment (a) to Paragraph A. Thus, it is appropriate to seek guidance from federal jurisprudence interpreting the analogous federal rule. Burdette v. Drushell, 2001-2494 (La.App. 1st Cir. 12/20/02), 837 So.2d 54, 62, writ denied, 2003-0682 (La.5/16/03), 843 So.2d 1132.

. Pursuant to LSA-R.S. 32:866(A), a motor-vehicle-accident victim’s recovery can be limited where the victim failed to "own or maintain compulsory motor vehicle liability security.” At the time of the accident at issue, the statute provided that there should be no recovery to the victim for the first $10,000.00 of bodily injury. By subsequent amendment by Acts 2008, No, 921, § 1, effective January 1, 2010 as to policies issued or renewed on or after that date, now provides that there should be no recovery for the first $15,000.00 of bodily injuiy.

. Additionally, we note that the limitations of recovery set forth in LSA-R.S. 32:866(A)(1) constitute an affirmative defense, and the party asserting the affirmative defense has the burden of proving that defense by a preponderance of the evidence. Hurst v. Judson, 2002-2412 (La.App. 1st Cir.7/2/03), 859 So.2d 53, 55. The only evidence of record concerning the issue of whether the Walleys owned or maintained compulsory motor vehicle liability insurance consists of a notation on the accident report indicating that the Walleys’ motorcycle was insured by "Progressive Sec. Ins.” and Daniel's testimony at trial that he provided proof of insurance at the scene and that his motorcycle repair costs were paid by his insurance company. Thus, defendants clearly failed to prove this affirmative defense.

. In their argument on this assignment of error, plaintiffs also contend that they were entitled to an adverse presumption that Me-trejean's testimony would prove unfavorable to defendants at trial because defendants "failed to make any effort to produce the witness or rely on her deposition testimony." Although an adverse presumption exists when a witness is available to a party and that party fails to call the witness, the presumption is rebuttable and should not apply when the witness is equally available to the opposing party. Augustus v. St. Mary Parish School Board, 95-2498 (La.App. 1st Cir.6/28/96), 676 So.2d 1144, 1152.
There is nothing to suggest that Metrejean was not equally available to both parties herein. Moreover, plaintiffs listed Metrejean as one of their witnesses in their pre-trial statement, and they did not request an adverse presumption at trial when she was not called to testify. Accordingly, we conclude that the adverse presumption is inapplicable. See Augustus, 676 So.2d at 1153.
Additionally, while the Supreme Court has applied the adverse presumption in a situation where a witness, even though equally available to the parties, would have given testimony favorable to only one party, Driscoll v. Stacker, 2004-0589 (La.App. 1st Cir. 1/19/05), 893 So.2d 32, 47, plaintiffs demonstrated in the trial proceedings inconsistencies in Metrejean's written statement, indicating that her testimony may not have been favorable only to defendants herein.

. Drivers executing left turns have a heavy burden of care under the law. See LSA-R.S. 32:122 & 32:104; Corvers, 673 So.2d at 1090 n. 3.

. While she testified that she saw a "flash” of Vargas’s vehicle, Alisa did have sufficient time after seeing Vargas to lift her right leg in order to avoid having her leg struck by Vargas's vehicle.

. Vargas testified that the vehicle that allowed her to pull onto Rushing Road was an orange Avalanche, the vehicle driven by Me-trejean. However, the evidence at trial established that the individual who left a space for her to pull out was in fact Steve Tregre, who was driving a Jeep Cherokee.

. Ruckstuhl stated that they were waiting behind another vehicle and, thus, their van was the second vehicle in line to exit the parking lot. However, he explained that their van "rides high,” and he recalled that the vehicle in front of them was a sedan. Thus, he was able to see over the vehicle in front of them.

. According to the accident report, the posted speed limit on Rushing Road was 45 miles per hour.

. Because Tregre was killed in an automobile accident prior to the trial of this matter, his deposition was introduced into evidence at trial. See LSA-C.C.P. art. 1450(A)(3)(a) and LSA-C.E. art. 804(A)(4).

. The record demonstrates that Tregre and Bush were involved in a romantic relationship at the time. Contrary to Bush's testimony that she was following Tregre in a separate vehicle, Tregre had testified in his deposition that Bush was a passenger in the front seat of his vehicle at the time of the accident.

. Bush later acknowledged that in her deposition, she had testified that at the point where she was stopped, Rushing Road was only a two-lane road, thus indicating that the left-turn lane had not started at that point.

. Bush's testimony that the motorcycle fell to the right contradicts the testimony of Dan *111 iel Walley, Alisa Walley, and Tregre and is not supported by the record.

. At the time of the accident, Bush was on the phone with Tregre, and they were arguing, indicating that her attention may have been distracted.

. Additionally, Vargas testified that Metreje-an’s vehicle was not in the left-turn lane at the time of the accident, but, instead, was in the outermost westbound lane.