ROSEMARY LEDET, Judge.
| iThis is a tort suit for personal injury and property damages arising out of an accident involving a pick-up truck and a garbage truck. The plaintiffs are the pickup truck’s driver, Bazzel Hamdan (“Mr. Hamdan”); front seat passenger, Mazen Hamdan (Mr. Hamdan’s brother); back seat passenger, Alvin Watson (Mr. Ham-dan’s tenant); and owner, Muhiden Ham-dan (Mr. Hamdan’s mother). The primary defendants are the driver of the garbage truck, Gregory Hicks, and the driver’s employer, IESI LA Corporation (“IESI”). Following a bench trial, the trial court found Mr. Hicks solely at fault and awarded damages to Mr. Hamdan, Mr. Watson, and Ms. Hamdan (collectively “Plaintiffs”). From this judgment, IESI appeals. On appeal, IESI raises issues regarding each driver’s liability, causation of damages, and Plaintiffs’ damage awards.
For the reasons that follow, we amend the trial court’s allocation of 100% of the fault to Mr. Hicks, reallocate fault 80% to Mr. Hicks and 20% to Mr. Hamdan, reduce the general’ damage awards, and reduce all Plaintiffs’ damage awards to reflect the reallocation of fault.[1] As amended, we affirm the trial court’s judgment.
19FACTUAL AND PROCEDURAL BACKGROUND
The accident in question occurred on August 10, 2009, at about 3:30 p.m., on South Carrollton Avenue (“Carrollton”) in New Orleans, Louisiana, near the intersection of Carrollton and Tulane Avenue. The accident occurred in front of the Burger King restaurant that was located at that intersection. At that location, Car-rollton had six travel lanes, three in each direction — east and west — divided by a concrete median. On the right side of the east lanes of Carrollton, in front of the Burger King, there was a bus stop with a fourth lane for loading, and unloading passengers — referred to as a “bus lane.”[2] On *661 the left side, directly across from the private driveway of the Burger King, there was an opening in the median for making left turns.
Shortly before the accident, the garbage truck, driven by Mr. Hicks, pulled out of the private driveway of the Burger King onto Carrollton. According to Mr. Hicks, he routinely picked up the trash at the Burger King. As part of his routine, he would exit from the private driveway, proceed across the three east bound lanes of Carrollton, make a left turn through the opening in the median, and continue westbound on Carrollton to complete his route. On the day of the accident, Mr. |sHicks was in the process of completing that turning maneuver when the accident occurred.
At the time of the accident, the garbage truck was perpendicular to Carrollton, obstructing most, if not all, of the east bound lanes of travel.[3] The accident occurred in the east bound, center lane of Carrollton when the pick-up truck, driven by Mr. Hamdan, struck the side of the garbage truck, driven by Mr. Hicks. As a result of the collision, Mr. Hamdan and both of his passengers claimed to have suffered personal injuries; and his mother, as owner of the vehicle, claimed to have suffered property damage in the amount of the deductible on her insurance policy.
Following the accident, three similar separate suits were filed. Mr. Watson filed suit against Mr. Hicks, IESI, Hub International Insurance Services, Inc. (“HUB”), Mr. Hamdan, Ms. Hamdan, and GEICO Casualty Company (“GEICO”) (“Suit 1”). IESI was alleged to be Mr. Hicks’ employer. IESI was alleged to be liable under the following two theories: (i) respondeat superior, and (ii) permissive use of the vehicle. HUB was alleged to be IESI’s insurer. GEICO was alleged to be the insurer of the pick-up truck. Mazen Hamdan filed suit against Coastal Waste Services, LLC;[4] Mr. Hicks; GEICO; and Mr. Hamdan (“Suit 2”). Mr. Hamdan and Ms. Hamdan filed suit against Mr. Hicks, IESI, and HUB (“Suit 3”).
1 thereafter, the trial court granted IE Si’s motion to consolidate the three suits. HUB was dismissed as a party from both suits in which it was named as a defendant (Suit 1 and Suit 3).[5] Mr. Watson and Mazen Hamdan settled their claims against Mr. Hamdan, Ms. Hamdan, and GEICO; hence, those claims were dismissed. Mazden Hamdan likewise settled his claims against Mr. Hicks and, IESI; hence, Mazden Hamdan’s entire suit (Suit 2) was dismissed.
Before trial, the plaintiffs in the two remaining suits (Suit 1 and Suit 3) — Mr. Hamdan, Mr. Watson, and Ms. Hamdan— stipulated that the amount in controversy did not exceed the jurisdictional amount required for a jury trial, $50,000.00. Mr. Watson further stipulated that he was no longer seeking lost wages or loss of future earning capacity. A motion for partial summary judgment was granted dismiss *662 ing Mr. Hamdan’s claims for lost wages and loss of future earning capacity. The issues remaining to be tried were thus narrowed to the personal injury claims of Mr. Watson and Mr. Hamdan, and the property damage claim of Ms. Hamdan.
On July 15, 2014, a bench trail was held. At trial, three witnesses testified — Mr. Hicks; Mr. Hamdan; and the investigating officer, New Orleans Police Department Officer Mark Miranda — and the deposition testimony of one witness — Mr. Watson — was introduced. The stipulated medical bills and records of both Mr. Hicks and Mr. Hamdan were introduced. Also, a photograph of the accident scene, taken shortly after the accident and before the vehicles were moved, was introduced (the “Photograph”). All three witnesses who testified at trial agreed that the Photograph accurately depicted the scene of the accident and | sthe position of the vehicles at the time of impact. The Photograph is reproduced below.
[[Image here]]
At trial, the two drivers gave diametrically opposing versions of what occurred. Mr. Hicks testified that he had sufficient time to complete the turning maneuver from the private driveway of the Burger King without creating a traffic hazard; whereas, Mr. Hamdan testified to the contrary. Other than the two drivers, there were no witnesses to the accident.[6]
Following the trial, the trial court rendered judgment finding Mr. Hicks solely at fault for the accident. The trial court awarded Mr. Hamdan general damages of $37,000.00 and special damages of $11,023.38; Mr. Watson general | ^damages of $36,000.00 and special damages of $12,786.57; and Ms. Hamdan special damages (the amount of her policy deductible) *663 of $500.00. From this judgment, IESI appeals.[7]
DISCUSSION
On appeal, IESI raises the following four assignments of error:
1. The trial court erred in finding that Gregory Hicks was at fault for the accident.
2. The trial court erred in assigning no fault to the plaintiff, Bazzel Ham-dan.
3. The trial court erred in finding the plaintiffs’ [Mr. Hamdan’s and Mr. Watson’s] physical injuries were related to the subject accident.
4. The trial court erred in finding that Muhiden Hamdan met her burden of proof with regard to her alleged property damages.
The issues presented can be grouped into two broad categories — liability and damages. We separately address each category.

Liability

The manifest error standard of review governs this court’s review of the trial court’s factual findings on the issue of liability. See Zito v. Advanced Emergency Med. Servs., Inc., 11-2382, pp. 4-5 (La.5/8/12), 89 So.3d 372, 375. In Zito, the Louisiana Supreme Court outlined the applicable principles of review as follows:
17It is well-settled in our jurisprudence that a reviewing court may not disturb the factual findings of the trier of fact in the absence of manifest error. Ardoin v. Firestone Polymers, L.L.C., 10-0245 at p. 6 (La.1/19/11), 56 So.3d 215, 219. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id. at 882-883. However, where documents or objective evidence so contradict the witness’ story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness’ story, the court of appeal may find manifest error or clear wrongness, even in a finding purportedly based upon a credibility determination. Id. at 882; Rosell v. ESCO, 549 So.2d 840 (La.1989)..
The- manifest error standard also governs this court’s review of the trial *664 court’s findings regarding the allocation of fault. Beggs v. Harrah’s New Orleans Casino, 14-0725, pp. 13-14 (La.App. 4 Cir. 1/21/15), 158 So.3d 917, 925. The jurisprudence is well-settled that appellate courts are required to give great deference to the trial court’s allocation of fault and that “[o]nly after making a determination that the trier of fact’s apportionment of fault is clearly wrong can an appellate court disturb the award.” Fontenot v. Patterson Ins., 09-0669, p. 22 (La.10/20/09), 23 So.3d 259, 274 (citing Clement v. Frey, 95-1119, 95-1163, p. 7 (La.1/16/96), 666 So.2d 607, 610-11). The Supreme Court has analogized an appellate court’s allocation of fault after a finding of manifest error to an appellate review of quantum assessments. Clement, supra.
In Duncan v. Kansas City Southern Railway Co., 00-0066, pp. 10-11 (La.10/30/00), 773 So.2d 670, 680-81, the Supreme Court summarized the standard of review applicable to allocation of fault determinations as follows:
This Court has previously addressed the allocation of fault and the standard of review to be applied by appellate courts, reviewing such determinations. Finding the same considerations applicable to lathe fault allocation process as are applied in quantum assessments, we concluded “the trier of fact is owed some deference in allocating fault” since the finding of percentages of fault is also a factual determination. Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607, 609, 610. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Id. Therefore, an appellate court should only disturb the trier of fact’s allocation of fault when it is clearly wrong or manifestly erroneous. Only after making a determination that the trier of fact’s apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court’s discretion. Clement, 666 So.2d at 611; Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1977).
“Fault in a collision is determined by judging the conduct of each motorist under all the circumstances of the particular case, including consideration of the so-called directional right of way.” Soniat v. State Farm Mut. Auto. Ins. Co., 340 So.2d 1097, 1099-100 (La.App. 4th Cir.1976) (citing Smith v. Borchers, 243 La. 746, 146 So.2d 793 (1962)). In this case, the governing statutory provision establishing the directional right of way is La. R.S. 32:124, which provides:
The driver of a vehicle about to enter or cross a highway from a private road, driveway, alley or building, shall stop such vehicle immediately prior to driving onto a sidewalk or onto the sidewalk area extending across any alleyway or driveway, ... and shall yield the right of way to all approaching vehicles so close as to constitute an immediate hazard.
Similar language is found in the governing ordinance, Orleans Parish Ordinance § 154-483, which provides:
The driver of a vehicle emerging from any alley, driveway or building shall stop such vehicle immediately prior to driving onto a sidewalk or the sidewalk area extending across any alleyway, yielding the right-of-way to any pedestrian, and upon entering the roadway shall yield the right-of-way to all vehicles approaching on such roadway.
The jurisprudence has interpreted La. R.S. 32:124 as imposing on the driver that is entering a highway from a private driveway a “primary or higher duty to | gavoid a collision.” Hebert v. Old *665 Republic Ins. Co., 01-355, p. 13 (La.App. 5 Cir. 1/29/02), 807 So.2d 1114, 1124. “Unusual, extreme, and high care toward favored traffic is required of such a motorist under the case law.” Walley v. Vargas, 12-0022, p. 17 (La.App. 1 Cir. 9/21/12), 104 So.3d 93, 105 (collecting cases).[8] “Conversely, the duty of the driver on the favored street toward the intruding motorist is the much-lesser ordinary care, and that driver generally may rely on the assumption or presumption that those vehicles entering the roadway from less-favored positions such as a private drive will not drive into the path of favored traffic.” Walley, 12-0022 at p. 17, 104 So.3d at 105.
Nonetheless, “[p]references on favored streets created by statutes, signal, or signs, do not relieve the driver traveling on the favored street from ordinary care.” Este v. Roussel, 01-1859, p. 12 (La.App. 4 Cir. 11/6/02), 833 So.2d 999, 1007-08 (citing Kirk v. Allstate Ins. Co., 366 So.2d 642, 644 (La.App. 3rd Cir.1978)). “ ‘[T]he favored driver can still be found eontribu-torily negligent [assessed comparative fault] if his/her substandard conduct contributed to the cause of the accident.’ ” Roussel, supra (quoting Thomasie v. Lee, 97-397, p. 8 (La.App. 5 Cir. 9/30/97), 700 So.2d 580, 584, citing Corvers v. Acme Truck Lines, 95-925 (La.App. 5 Cir. 4/16/96), 673 So.2d 1088, 1090). Moreover, “[i]f a motorist fails to see what he should have seen, then the law charges him with having seen what he Lnshould have seen, and the court examines his subsequent conduct on the premise that he did see what he should have seen.” Sanchez Fernandez v. General Motors Corp., 491 So.2d 633, 636-37 (La.1986). In sum, “the fact that one driver may have had a directional right-of-way does not mechanically vest liability with the other driver; a determination of fault must be made by examining the conduct of both motorists under all the facts and circumstances.” Corona v. Dunbar, 417 So.2d 452, 455 (La.App. 1st Cir.1982) (citing Zemo v. Louviere, 349 So.2d 420 (La.App. 4th Cir.1977), and Gutelius v. Phoenix Ins. Co., 266 So.2d 717 (La.App. 4th Cir.1972)).
As noted, IESI’s first two assignments of error pertain to the trial court’s allocation of fault solely to its employee, Mr. Hicks. IESI acknowledges that Mr. Hicks had a heightened duty as the driver who was entering the roadway from a private driveway — the Burger King parking lot. IESI, however, points out that this heightened duty does not prohibit a driver from exiting a private driveway and safely completing such a left turning maneuver. IESI contends that Mr. Hicks met his heightened burden. In support, it cites Mr. Hicks’ testimony that when he began to exit the private driveway, he stopped and observed no oncoming traffic in the eastbound lanes. IESI emphasizes that the only. evidence presented that Mr. Hicks pulled out in front of Mr. Hamdan was Mr. Hamdan’s self-serving testimony. IESI thus submits that Mr. Hicks was *666 completely reasonable in entering the roadway.[9]
IESI further contends that Mr. Hicks was unable to avoid the accident because he could not proceed forward for fear of causing another collision with the Intraffic in the westbound lanes of Carrollton. IESI cites Mr. Hicks’ testimony that he ensured he left at least one lane of traffic — the far right lane — open and clear and that he only temporarily obstructed traffic on the eastbound lanes of Carrollton. According to IESI, Mr. Hamdan was in the best position to avoid the accident; rather than veering to the center lane, Mr. Ham-dan simply could have remained in his original lane of travel — the right lane. Moreover, IESI contends that Mr. Ham-dan failed to see what he should have seen — a large garbage truck attempting to make a left turn. IESI notes that the accident occurred on a clear afternoon’ and that there was no evidence of any extenuating circumstances out of Mr. Hamdan’s control. To the contrary, the police report states that Mr. Hamdan told the officer at the scene that he was distracted because he was on his cell phone and that the brakes on the pick-up truck he was driving were faulty.
IESI also cites Mr. Watson’s testimony that when the accident occurred the trio— Mr. Hamdan, his brother, and Mr. Watson — was en route to Burger King to eat. The Burger King was located on the right hand side of Carrollton, which would have required the pick-up truck to be traveling in the right lane. According to Mr. Watson, Mr. Hamdan was originally driving the pick-up truck in the right lane, but he swerved into the center lane when the collision occurred. IESI thus contends that the trial court erred in failing to find Mr. Hamdan solely at fault for causing the accident. In the alternative, IESI contends that the trial court erred in failing to find comparative fault on the part of both drivers.
Plaintiffs counter that the trial court’s factual finding that Mr. Hicks was solely at fault is supported by the record and thus is not manifestly erroneous. Plaintiffs point out that this is a fact-intense case and that the only uncontroverted fact is that Mr. Hicks failed to observe the approaching vehicle — the pick-up truck | ]2Mr. Hamdan was driving. Plaintiffs emphasize that the Photograph shows the garbage truck blocking the three eastbound travel lanes of Carrollton, and an unrelated vehicle using the bus lane to get around the obstruction. Plaintiffs point out that the Photograph establishes the three eastbound travel lanes of Carrollton were obstructed by the garbage truck; the far right lane of Carrollton that was unobstructed was the bus lane, which is not a general travel lane.
Resolution of the fact-intense issue regarding the drivers’ fault requires that we review the testimony presented at trial.
Officer Miranda, who investigated the accident, testified that he spoke to both drivers at the accident scene. He also spoke to one of the passengers in the pickup truck, who was on a stretcher when the officer arrived and who was transported by ambulance to the hospital. Officer Miranda did not speak to the other passenger in the pick-up truck, Mr. Watson. Officer Miranda explained that he had a general recollection of the accident because it was *667 one of the first accidents that he investigated as an officer. He further explained that he recalled the following details regarding the accident:
The dump truck was exiting a public parking lot to Burger King. He [Mr. Hicks] stated that as he was exiting the public parking lot of the Burger King, he looked to his left for oncoming traffic, which was driving eastbound on South Carrollton. He stated the traffic was clear. There was no oncoming traffic so he proceeded out of the parking lot across Carrollton and waited at the median on Carrollton for westbound traffic on Carrollton to clear so he could make a left-hand turn.
Operator of vehicle number two, the pickup, stated he was driving eastbound on South Carrollton, at which point a dump truck came out of the public parking lot into his lane of travel, he applied his vehicle’s brakes, he stated they were faulty, also stated that he was on his cell phone, and struck the dump truck on South Carrollton Avenue.
11sOfficer Miranda acknowledged that he specifically recalled Mr. Hamdan stating that he was on his cell phone; however, he did not specifically recall Mr. Hamdan stating that he was distracted by the cell phone or that his brakes were faulty. Nonetheless, the police report, which Officer Miranda prepared, stated that Mr. Hamdan made those statements. Officer Miranda explained that he would have written in his report what Mr. Hamdan stated to him. He testified that his procedure was to write down in the report “the specific statements in regard to the accident, but not everything that they said.” He acknowledged that the report was not a verbatim recordation of the witnesses’ statements.
According to Officer Miranda, the operator of the garbage truck was attempting to make a legal left turn through the median. The basis for his conclusion that it was a legal left turn, Officer Miranda explained, was the garbage truck driver’s statement that the eastbound lane of travel was clear. Because of the drivers’ conflicting statements, he testified that no citations were issued for any violations for the accident itself. Mr. Hamdan, however, was issued a citation for not having registration or proof of insurance in the vehicle.
Mr. Watson, the other passenger in the pick-up truck who Officer Miranda failed to interview, was present at trial; however, he did riot testify. Instead, his deposition testimony was introduced by stipulation of the parties. Mr. Watson testified that, at the time of the accident, the trio were driving around, listening to music on the radio, laughing, and talking. Mr. Watson further testified that at the time of the accident the trio was en route to eat at Burger King. According to Mr. 114Watson, Mr. Hamdan was not on his cell phone. He testified that he not recall anything until after the crash.[10]
Mr. Hamdan testified that the accident occurred when he, accompanied by two *668 passengers (his brother and Mr. Watson), was travelling eastbound on Carrollton and a garbage truck, driven by Mr. Hicks, quickly pulled out of the driveway to the Burger King marked “Entry.” Although he attempted to stop by sharply applying his breaks, he testified that he was unable to do so. Indeed, Mr. Hamdan testified three times that he had no chance to stop or to prevent the accident. First, he testified as follows: “I’m driving up Carrollton basically and going towards Tulane, and basically he [Mr. Hicks] pulls out right in front of me. I had no chance to stop.” Second, he testified that he told the officer that the truck had pulled in front of him, that he slammed right into him, and that he “had no chance of stopping.” Third, he testified that he had no opportunity to prevent the collision; specifically, he testified:
I tried to stop the vehicle the best way I can. It basically took my vehicle to the right after I hit the brakes so hard. As you can see [in the Photograph] that’s why I’m at the angle like that. As he was pulling out so fast, I’m going straight, I run, I slammed into him so hard, it actually pulled us.
Immediately after the accident, Mr. Ham-dan testified that he called the police.[11]
11fiAt trial, Mr. Hamdan was asked to read into the record the portion of the police report regarding what he was reported to have told the officer at the scene; the portion of the report that he read was as follows:
The operator of the vehicle two [Mr. Hamdan] stated that his vehicle was traveling eastbound on South Carrollton Avenue when vehicle one [Mr. Hicks] pulled in his vehicle’s path causing him to sharply apply his brakes. Operator of vehicle two stated that the brakes to his vehicle [were] faulty and that he was also distracted by talking on his cell phone. Operator of vehicle two stated that he struck vehicle one as he was applying his brakes.
Mr. Hamdan denied telling the officer either that he was distracted because he was on his cell phone or that his brakes were faulty. He explained that after the accident he “had a concussion or whatever.” [12]
Mr. Hamdan testified that when the collision occurred he was in the center lane. He denied seeing either any turning signals on the garbage truck or the garbage truck driver looking around. On cross-examination, however, Mr. Hamdan acknowledged that he did not have an accurate recollection of the accident. Mr. Hamdan initially testified that when the accident occurred, the trio — he and his two passengers — was en route to McDonalds. He clarified they were going to his house and looking for a McDonalds around City Park. When asked about his deposition *669 testimony that they were going to drop his brother off somewhere uptown, Mr. Ham-dan replied that since they were just getting off of hfiwork, they were “doing all of this” — dropping off his brother and getting something to eat.
Mr. Hicks testified that at the time of the accident he was driving a front load garbage truck in the scope of his employment with IESI. He had been a commercial driver, with a commercial driver’s license (“CDL”), for twenty years. During that time, his CDL had never been suspended, restricted, or revoked; he had never been in any prior accidents. The area of Tulane and Carrollton where the accident occurred was part of his regular route; the Burger King located at that intersection was one of his regular stops. As a result, he was very familiar with the entrance and exit to the Burger King.
Mr. Hicks testified that the accident occurred on a sunny afternoon. At the time of the accident, he described where he was coming from and going to as follows:
I had just finished dumping a garbage can. I was about to leave the parking lot. I looked to the left, there was no traffic. I proceeded out the parking lot, across the intersection to wait for the traffic on the right. I was stopped. I was stopped about 15, 20 seconds. As I looked to the left I saw the guy coming up in the right lane. For some reason, I don’t know why he did it, he turned into the middle [center] lane and hit the truck while I was sitting there.
As to how Mr. Hamdan ended up in the center lane, Mr. Hicks testified that Mr. Hamdan turned into that lane. Explaining how he was able to see the pick-up truck before the accident, Mr. Hicks testified that it was his habit to be “always on the pivot” — looking right, left, and watching all angles of the traffic. When asked why, if he was vigilant, he did not see the pick-up truck when he pulled out the driveway, Mr. Hicks replied “[b]eeause he was not there.” Continuing, he testified that “[t]here [were] no cars coming up the street. That was the only reason for me pulling that big truck out there facing the way it is now.”
|17In response to the question of what was his estimate of the speed at which he was going when he crossed the lanes of Carrollton, Mr. Hicks testified that he “rolled” the garbage truck slowly out from the private driveway. He explained that by “rolled” he meant that he simply took his foot off the accelerator and allowed the vehicle to roll forward. He stated that “coming out of the parking lot it’s a roll. It’s no ignition needed or nothing. It’s just a roll.” Mr. Hicks further testified that when the accident occurred, he was completely stopped in the middle of the street. He explained that he was stopped by the crossing to make his left turn and that he was sitting there waiting for the traffic to clear on his right.
As to the degree of obstruction of the road that his garbage truck posed, Mr. Hicks testified that “[t]he right lane behind me was open ... [and] clear. I was just blocking — the back of my truck had cleared that last lane right there by the driveway.” He testified, based on the Photograph, that the right lane was clear. He indicated this was evidenced by another car driving by. When asked why he did not pull further forward, Mr. Hicks responded that “[t]he truck was still too long. I wasn’t going to clear all of it.” He further added that he felt he was at a “safe distance” and that “there was no need for [him] to go farther.” He still further added that he “did that [maneuver] every time [he went to] dump that can.”
At the close of the evidence, the trial court took the case under advisement, noting it was a “fact intensive case.” There-
*670 after, the trial court, agreeing with Plaintiffs, found Mr. Hicks solely at fault. The trial court, in its written reasons for judgment, stated as follows:
[I]t is the conclusion of this Court that the plaintiff had the right of way on the superior street.... In crossing the superior street, the defendant vehicle violated both Orleans Parish Ordinance [§ ] 154 — 483 and Louisiana Statute R.S. 32:124 regarding vehicles entering a roadway from a private drive. The Orleans Parish Ordinance is more | ^restrictive than the Louisiana Statute and requires that vehicles “upon entering the roadway shall yield the right-of-way to all vehicles approaching on such roadway.” While violation of a statute is not negligence per se, it is considered when determining if the breach of that statutory duty caused the damage.
The defendant, Mr. Hicks, had alleged in testimony that the plaintiff driver had actually changed lanes from the right lane to the middle lane or alternatively had the last clear chance to avoid the collision by switching from the center lane to the right lane of travel; however, this was controverted by the demonstrative evidence showing a picture of the collision scene shortly after occurrence, showing the defendant vehicle blocking all three lanes of South Carrollton Avenue. The testimony of both Mr. Hicks [sic] and Officer Mark Miranda, the police officer responding to the scene, is that the picture shows the defendant vehicle obstructing all three lanes of South Carrolton Avenue. Further Mr. Hicks testified that he saw the plaintiff approaching, yet failed to state that he took any actions to avoid the collision. The defendant testified that he did not pull his truck forward, although the picture evidence displayed that the turning lane in front of him was clear.
In addressing the trial court’s finding of fault on the part of Mr. Hicks, we find it unnecessary to base on our decision on a resolution of the drivers’ conflicting testimony regarding whether Mr. Hicks’ should have seen the pick-up truck driven by Mr. Hamdan when he pulled out of the private driveway — the Burger King parking lot. Instead, we find support in the record for a finding of fault on the part of Mr. Hicks based on the fact, by his own admission, that he was obstructing the east bound lanes of traffic on Carrollton for fifteen to twenty seconds when the accident occurred.
“The obstruction of highways not only impedes passage, but also creates a risk that a confused or inattentive driver will collide with the stationary vehicle. The risk of harm created by a motorist’s obstructing a highway imposes a reciprocal duty on motorists to refrain from doing so.” Haas v. Southern Farm Bureau Cas. Ins. Co., 321 So.2d 380, 382 (La.App. 4th Cir.1975). Although Mr. Hicks testified that he was not blocking the right hand lane of traffic, his |19testimony — as Plaintiffs contend and the trial court found — is contradicted by the Photograph. The Photograph establishes that the only eastbound lane that was not obstructed by the garbage truck was the bus lane. Moreover, as the trial court noted, Mr. Hicks could have pulled further forward into the median, which was clear, and lessened the degree of obstruction. For these reasons, we find no error in the trial court’s finding of fault on the part of Mr. Hicks.
Our finding of no manifest error in the trial court’s finding of fault on the part of Mr. Hicks, however, does not end our analysis. We next must determine whether, as IE SI contends, the trial court erred in failing to find comparative fault on the part of Mr. Hamdan. As noted, IESI contends that Mr. Hamdan failed to see *671 what he should have seen — the garbage truck obstructing the road — and failed to remain in his lane of travel — the right lane. Mr. Hamdan, on the other hand, contends that he was free from fault because the garbage truck pulled out quickly in front of him; and he had no opportunity to avoid the collision.
As noted above, contrary to IESI’s contention, the right lane of travel was obstructed. The bus lane, however, was not obstructed. The Photograph reflects that Mr. Hamdan had available to him a clear lane, albeit a bus lane. Although parking in the bus lane is prohibited, travel in it to make a turn is not prohibited. As this court has noted, “the section of the New Orleans Code [the ordinance] dealing with bus stops does not prohibit a motorist from traveling in that area for the purpose of making a turn.” Smith v. Vazquez, 05-0619, p. 5 (La.App. 4 Cir. 5/31/06), 933 So.2d 878, 882 (citing Winfield v. Dih, 01-1357, p. 9 (La.App. 4 Cir. 4/24/02), 816 So.2d 942, 948). By logical extension, we conclude that the ordinance would not prohibit a motorist from traveling in the bus lane for the purposes of avoiding an obstruction on the highway. Indeed, the Photograph |2odepicts a vehicle using the bus lane to get around the obstruction posed by the accident scene.
The Photograph also reflects the point of impact was the back rear quarter panel of the garbage truck. The location of the point of impact indicates that Mr. Hamdan violated his duty to see what he should have seen — a large garbage truck stopped crosswise on Carrollton blocking all three eastbound lanes of travel.
Having found that the trial court was clearly wrong in failing to find that Mr. Hamdan violated his duties and thus was at fault for causing the accident, we must re-allocate fault. The principles enunciated in the Clement case for allocating fault have been applied when a fact-finder incorrectly finds one party fault free, such as the trial court did in the instant case. See Toston v. Pardon, 03-1747 (La.4/23/04), 874 So.2d 791 (applying the Clement principles to reallocate fault after finding the trial court committed error in finding one party free from fault); see also Brewer v. J.B. Hunt Transp., Inc., 09-1408, p. 21 (La.3/16/10), 35 So.3d 230, 244; Edwards v. Pierre, 08-0177, p. 12 (La.App. 4 Cir. 9/17/08), 994 So.2d 648, 658; Prejean v. Rabalais, 08-436, p. 5 (La.App. 3 Cir. 12/10/08), 998 So,2d 1225, 1228-29.
In allocating fault, the Louisiana Supreme Court has instructed that courts must consider both the nature of the parties’ conduct and the extent of the causal relationship between the parties’ conduct and the damages claimed. Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967, 974 (La.1985). In Watson, the Supreme Court also enumerated the following five factors that may influence the degree of fault assigned: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances |¾1 which might réquire the actor to proceed in haste, without proper thought. Watson, 469 So.2d at 974. “These same factors guide the appellate court’s determination as to the highest or lowest percentage of fault that could reasonably be assessed.” Beggs, 14-0725 at p. 14, 158 So.3d at 926 (citing Clement, 666 So.2d at 611).
Based on our analysis of the Watson factors, we conclude that Mr. Hicks bears the greater fault for the subject accident. We thus assess Mr. Hicks’ fault at 80%, and Mr. Hamdan’s fault at 20%, which is *672 the lowest amount the trial court could have reasonably allocated to him.

Damages

 In this case, the trial court awarded two types of compensatory damages — special and general. Special damages are defined as “those which either must be specially pled or have a ‘ready market value,’ i.e. the amount of damages supposedly can be determined with relative certainty.” Wainwright v. Fontenot, 00-0492, p. 5 (La.10/17/00), 774 So.2d 70, 74. Certain types of special damages, including medical expenses, are easily measured. Smith v. Escalon, 48,129, p. 10 (La.App. 2 Cir. 6/26/13), 117 So.3d 576, 583. A plaintiff is required to prove special damages by a preponderance of the evidence. Mack v. Wiley, 07-2344, p. 14 (La.App. 1 Cir. 5/2/08), 991 So.2d 479, 489. The standard of review applicable to an award of special damages is the manifest error standard. Kaiser v. Hardin, 06-2092, pp. 11-12 (La.4/11/07), 953 So.2d 802, 810.
General damages are defined as “those which may not be fixed with pecuniary exactitude;” instead, they “involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms.” Duncan v. Kansas City Southern Railway Co., 00-0066, p. 13 (La.10/30/00), 773 So.2d 670, 682. For that reason, general damage awards are reviewed under the “much discretion” standard of La. C.C. art.1999, which provides “[w]hen damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages.” See also La. C.C. art. 2324.1 (providing that “[i]n the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury”); Cone v. National Emergency Services, Inc., 99-0934, p. 8 (La.10/29/99), 747 So.2d 1085, 1089 (citing Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) (holding that an abuse of discretion standard applies to the review of general damage awards)).
On appeal, IESI contends that all of the damage awards to Plaintiffs were improper. We divide IESI’s argument on this issue into two parts — IESI’s claims that the personal injury awards to Mr. Hamdan and Mr. Watson were either unsupported or excessive, and its claim that the property damage award to Ms. Hamdan was unsupported. We separately address each of these issues.
Awards to Mr. Hamdan and Mr. Watson
IESI contends that the trial court erred in finding that Mr. Hamsen’s and Mr. Watson’s personal injuries were caused by or related to the subject accident. IESI acknowledges that a plaintiff with a preexisting condition is entitled to be compensated if the defendant’s negligent act caused an aggravation of the preexisting condition. IESI, however, points out that the plaintiff has the burden of establishing the causal link between the defendant’s negligent act and the degree of aggravation. White v. State Farm Mut. Auto. Ins. Co., 97-1704 (La.App. 3 Cir. 4/29/98), 713 So.2d 618. IESI contends that Mr. Ham-dan and Mr. Watson failed to meet their burden of proof. In support, IESI emphasizes that, at the time of the | ^accident, both Mr. Hamdan and Mr. Watson were treating for injuries similar, if not identical, to the injuries they allegedly sustained in the accident. It contends that they presented no evidence to suggest that their injuries had resolved by the time of the accident or that their condition changed in any way after the accident.
*673 The jurisprudence has recognized, as IESI contends, that “[i]f the evidence establishes that a plaintiffs pre-accident and post-accident conditions are identical in all meaningful respects, the plaintiff has failed to carry his burden of proving causation.” Chavers v. Travis, 04-0992, p. 9 (La.App. 4 Cir. 4/20/05), 902 So.2d 389, 394-95 (citing Juneau v. Strawmyer, 94-0903, p. 8 (La.App. 4 Cir. 12/15/94), 647 So.2d 1294, 1300); see also Frost v. Carter, 13-0375, pp. 7-9 (La.App. 4 Cir. 4/2/14), 140 So.3d 59, 64-65. In this case, the trial court found that Mr. Hamdan and Mr. Watson met their burden of proving causation of the aggravation of their pre-exist-ing conditions.
The trial court, in awarding damages to Mr. Hamdan and Mr. Watson, based its awards on the testimony and the stipulated medical bills and reports introduced into evidence. Indeed, the only medical evidence presented in this case was the stipulated- medical records of Mr. Hamdan and Mr. Watson, which the trial court summarized in its reasons for judgment.
In its reasons for judgment, the trial court provided the following reasons for its damage awards of $37,000.00 in general damages and $11,023.38[13] in special damages to Mr. Hamdan:
[¾* [Mr. Hamdan] was treated by the emergency department of Touro Hospital incurring charges to the ER [emergency room] and radiology departments of $3,188.00 and charges to the Touro Infirmary of $1,275.20.
• Mr. Hamdan sought further medical treatment for his injuries from the Chiropractic Care Clinic for headaches, pain in his neck, chest, upper back, right knee and right shoulder. For these injuries, he received treat- ■ ment from the date of September 1, 2009 through September 17, 2009, incurring charges of $825.00 with little improvement, whereupon he was advised to continue treatment with his medical doctor, Dr. William Alden at the Metropolitan Health Group.
• The testimony at trial showed that Mr. Hamdan was under treatment for injuries to his neck and back from a prior accident with the Metropolitan Health Group and the Chiropractic Care Clinic.[14] The submitted medicals reflect this treatment, as well as further treatment for right knee pain, right shoulder pain, pain of the nose and head, which included different areas of the body than were in addition to any previous medical treatment.
• Testimony at trial also revealed that the prior injuries of Mr. Hamdan were aggravated and made worse by the instant vehicle collision.
• Mr. Hamdan’s initial office visit with the Metropolitan Health Group after the collision was August 18, 2009, and he remained under treatment with Metropolitan Health Group until August 28, 2010, incurring charges of $5,735.60. As part of his medical treatment Mr. Hamdan received nine *674 (9) injections from August 18, 2009 through March 3, 2010, in attempts to alleviate his pain.
• He remained under active medical care [for] a period of twelve (12) months and his medical bills totaling $11,028.38.
In its reasons for judgment, the trial court provided the following reasons for its damage awards of $36,000.00 in general damages and $12,786.57 in special damages to Mr. Watson:
• [Alvin Watson] did not testify at trial, but the parties stipulated to the submission of his deposition testimony as his best recollection of events, which occurred almost five years before the trial, and his injuries. Mr. Watson testified that in the collision, his head hit the glass and that he was dizzy after the accident. Mr. Watson further testified that he was found | ^unconscious in his apartment about five (5) days after the collision,[15] whereupon he was taken to the emergency room at Ochsner Hospital on August 14, 2009.
• The medical records show that he suffered from nausea and vomiting for several days prior to the August 14, 2009 admission and had head and neck pain. A CT scan of the head showed an abnormality of the left frontal lobe, of the brain consistent with a contusion and right occipital soft tissue swelling/bruising. The principal diagnosis shows as “frontal lobe contusion, uncontrolled diabetes mellitus type 2, essential hypertension.” The medical records show that Mr. Watson was admitted for two (2) days.
• Deposition testimony shows that Mr. Watson receives SSI and Medicaid benefits as a result of reduced mental capacity. Medical records illustrate that Medicaid was billed for his medical care in the amount of $10,884.67, with a primary diagnosis code of 851181, Brain Lacer NEC W/O Coma (Other and unspecified Cerebral Laceration And Contusion, Without Mention Of Open Intracra-nial Wound, With No Loss of Consciousness).[16]
• Testimony and medical records show that Mr. Watson was under medical treatment with Metropolitan Health Group for a prior injury, but that he did not have a prior head injury.
• The medicals submitted by Metropolitan Health Group show that prior to this collision Mr. Watson was being treated for cervical strain and lumbar strain, but that after this collision he was treated for post traumatic cephalgia[17] and thoracic strain in addition to cervical and lumbar strain. His initial office visit with the Metropolitan Health Group after the collision was August 17, 2009, and he remained under treatment with them until December 22, 2009, incurring charges of $1,901.90. Mr. *675 Watson remained under active medical care [for] a period of five (5) months and has medical bills totaling $12,786,57, but which were reduced as per the payment practices of Medicaid.
We first address the trial court’s special damage awards. The gov- ■ erning principles regarding such awards are as follows:
|2|¾* When a plaintiff alleges that he or she has incurred medical expenses as a result of injuries suffered in an accident and that medical treatment is evidenced by a bill, the bill is sufficient to support an award for past medical expenses “unless there is sufficient contradictory evidence or reasonable suspicion that the bill is unrelated to the accident.” Earls v. McDowell, 07-17, pp. 7-8 (La.App. 5 Cir.5/15/07), 960 So.2d 242, 248 (citing Stiltner v. National Union Fire Ins. Co., 00-2230 (La.App. 4 Cir.10/3/01), 798 So.2d 1132).
• A tortfeasor is required to pay the expenses of over treatment or unnecessary medical treatment, “unless such treatment was incurred by the victim in bad faith.” Montgomery v. Kedgy, 44,601, p. 9 (La.App. 2 Cir.8/26/09), 21 So.3d 980, 986-87 (citing Green v. Nunley, 42,343-14 (La.App.2d Cir.8/15/07), 963 So.2d 486; and Sumrall v. Sumrall, 612 So.2d 1010 (La.App. 2d Cir.1993)).
• Absent bad faith, “it is error for the trier of fact to fail to award the full amount of medical expenses that are proven by a preponderance of the evidence that were incurred as a result of an accident.” Earls, 07-17, p. 8, 960 So.2d at 248 (citing Simon v. Lacoste, 05-550 (La.App. 3 Cir. 12/30/05), 918 So.2d 1102); Boxie v. Smith-Ruffin, 07-264, p. 13 (La.App. 5 Cir. 2/6/08), 979 So.2d 539, 548.
Applying those principles, we find all of the past medical expenses awarded as special expenses to Mr. Watson and Mr. Hamdan are supported by the record and related to the accident with two possible exceptions. The two exceptions, which require further analysis, are the bill for Mr. Watson’s two-day hospitalization at Ochs-ner, and the charges for Mr. Hamdan’s continued treatment at Metropolitan Health Group (Dr. Alden) from May 27, 2010 to August 2010. We separately address these two items.
As to the Ochsner hospitalization bill, Mr. Watson was admitted to Ochsner hospital on April 14, 2009, four days after the accident, and remained in the hospital for two days. Although Mr. Watson’s admission to Ochsner was based in part on his diabetes, the hospital records reflect that Mr. Watson’s chief complaint when he presented to the emergency room was that he passed out after a motor | ^vehicle accident that occurred four days before the admission. The hospital records reflect that Mr. Watson experienced an episode of syncope[18] and had fallen. Mr. Watson was diagnosed as having a concussion. As IESI acknowledges, it is unclear if the concussion was related to the accident or to the fall Mr. Watson experienced as a result of the syncope. IESI suggests that it can be inferred that the concussion was related to the fall as a result of the syncope, not the accident. In support, IESI cites the fact that the syncope was determined not to be related to head trauma, but “due to volume depletion.” IESI emphasizes that Mr. Watson would have been *676 discharged within twenty-four hours of admission but for the need to observe him due to his elevated glucose levels. IESI also emphasizes that throughout the hospital stay Mr. Watson was administered Valium to avoid “DTs” as a result of his cocaine and alcohol abuse.
Nonetheless, the record reflects that Mr. Watson’s visit to the Ochsner emergency room, which resulted in the hospital admission, was prompted, at least in part, to seek treatment for the injury he sustained when he hit his head in the accident, which occurred four days earlier. A review of the Ochsner records reveals that the syncope episode was determined to be “likely due to volume depletion.” As IESI acknowledges, it is unclear whether the concussion, which Mr. Watson was diagnosed as having, was related to the accident or the fall as a result of the syncope. Given these circumstances, we cannot conclude the trial court was manifestly erroneous in awarding Mr. Watson the entire amount billed to Medicaid for the hospitalization as a special expense.
| 28The other medical bill that we find questionable is the bill for Mr. Ham-dan’s continuation of treatment at Metropolitan Health Group with Dr. Alden following the May 27, 2010 visit at which Dr. Alden found Mr. Hamdan had reached maximum medical improvement. IESI suggests that any subsequent treatment was unrelated to the accident. A careful review of Dr. Alden’s reports, however, supports the trial court’s factual finding that Mr. Hamdan continued, in good faith, to treat with that provider through August 2010. The trial court’s finding is supported by Dr. Alden’s June 25, 2010 recommendation that Mr. Hamdan was to “continue with conservative treatment here in the office.”[19] Hence, we cannot conclude the trial court was manifestly erroneous in finding Mr. Hamdan’s continuation of treatment with the provider through August 2010 was related to the accident and in awarding the medical expenses for such treatment.
Accordingly, we affirm the special damage awards to Mr. Hamdan and Mr. Watson. We now turn to the general damage awards.[20]
UoThis court summarized the well-settled principles applicable to a review of a general damage awards in Dixon *677 v. Travelers Ins. Co., 02-1364, pp. 9-15 (La.App. 4 Cir. 4/2/03), 842 So.2d 478, 484-88. The pertinent principles applicable in this case are as follows:
• Given that “[reasonable persons frequently disagree about the measure of general damages in a particular case,” a general damage award, may be disturbed on appeal only when “the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circum: stances.” Youn, 623 So.2d at 1261. The jurisprudential theme that has emerged is that “the discretion vested in the trier of fact is ‘great,’ and even vast, so that an appellate court should rarely disturb an award of general damages.” Id.
• An interplay often arises between the manifest error and the abuse of discretion standards of review. Guillory v. Insurance Co. of North America, 96-1084, p. 1, n. 1 (La.4/8/97); 692 So.2d 1029, 1036 (Lemmon, J., concurring). Explaining that interplay, former Justice Lemmon aptly stated:
The “much discretion” standard applies to the amount of the award of general damages. But there are often factual issues in a review of an award of general damages, such as whether a certain condition was caused by the tort. Of course, most issues decided by courts are mixed fact-law questions, and the fact determinations are reviewed under the manifest error standard. Id.
• In Youn, the Supreme Court reiterated its disapproval of an appellate court “simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff’ and also reiterated its disapproval of “the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case.” Id. Indeed the settled jurisprudential rule is that resort to prior awards is only appropriate after an appellate court has concluded that an “abuse of discretion” has occurred. Cone, 99-0934 at p. 8, 747 So.2d at 1089.
• In determining whether an “abuse of discretion” has occurred, the Youn court notes that “[ejach case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.” Id.
General damages may be established in three ways: (i) the circumstances of the case, (ii) expert medical testimony, and (iii) the tort victim’s testimony. Frank |3nL. Maraist & Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 7.02[3] (2004 ed.). “General damages do not have a common denominator and are determined on a case by case basis.” Glasper v. Henry, 589 So.2d 1173, 1180 (La.App. 4th Cir.1991) (citing Bernard v. Royal Insurance Co., 586 So.2d 607 (La.App. 4th Cir.1991)). The jurisprudence holds that the duration of a plaintiffs symptoms and treatment are relevant factors that courts must consider in assessing general damages. See Gillmer v. Parish Sterling Stuckey, 09-0901 (La.App. 1 Cir. 12/23/09), 30 So.3d 782, 788; Glasper, supra (noting the factors to be considered in *678 assessing quantum for pain and suffering are severity and duration).
In assessing general damages, one of the issues the trial court in this case had to determine was whether Mr. Hamdan and Mr. Watson met their burden of proof, by a preponderance of the evidence, that they suffered an aggravation to their preexisting injuries as a result of the accident and the duration of the aggravation to their injuries. See Lohenis v. Rousse, 14-1078 (La.App. 1 Cir. 3/9/15), 166 So.3d 1020. Such issues generally require medical testimony. Chavers v. Travis, 04-0992, p. 10 (La.App. 4 Cir. 4/20/05), 902 So.2d 389, 395. As noted, there was no expert medical testimony presented in this case. Nonetheless, the trial court found, based on the testimony of the parties and the stipulated medical records, that Mr. Ham-dan and Mr. Watson met their burden of proving an aggravation of their pre-exist-ing injuries. We cannot conclude the trial court’s factual finding on this issue was manifestly erroneous.
The record is unclear whether either Mr. Hamdan or Mr. Watson proved the accident caused any new injuries. As to Mr. Watson, IESI contends that the only new injury he allegedly sustained was a short-term headache. We find that the record supports a finding that Mr. Watson suffered a head injury related to the | S1 accident. The duration of that injury, however, is unclear. Regardless, as the trial court found, Mr. Watson only treated for his injuries related to this accident for a period of five months.
As to Mr. Hamdan, IESI contends that the trial court erred in finding that the treatment Mr. Hamdan received for his right knee pain and right shoulder pain were new areas of injury for which he was not receiving treatment before the accident. The trial court’s statement on which IESI’s contention is based is as follows:
The testimony at trial showed that Mr. Hamdan was under treatment for injuries- to his neck and back from a prior accident with the Metropolitan Health Group and the Chiropractic Care Clinic. The submitted medicals reflect this treatment, as well as further treatment for right knee pain, right shoulder pain, pain of the nose and head, which included different areas of the body than were in addition to any previous medical treatment.
Contrary to IESI’s contention, we do not read the trial court’s reasons for judgment, quoted above, as specifically delineating Mr. Hamdan’s new injuries caused by this accident as opposed to his pre-existing injuries. Nor do we find Mr. Hamdan’s trial testimony, noted earlier in this opinion, clear as to what new injuries he allegedly sustained as a result of this accident.
In its reasons for judgment, the trial court did not directly address the general damages issue. Indeed, the general damage awards are not mentioned in the reasons for judgment. Based on our review of the record, we conclude that Mr. Ham-dan and Mr. Watson treated for twelve and five months, respectively, for what was primarily an aggravation of preexisting soft tissue injuries. No medical proof of the extent of the aggravation was provided. Nor was any medical proof provided as to when Mr. Hamdan and Mr. Watson returned to their pre-accident state. 132Given these circumstances, we find the trial court’s general damage awards of $37,000.00 to Mr. Hamdan and $36,000.00 to Mr. Watson were unreasonable.
Based on our review of other awards, we find the highest reasonable award to Mr. Hamdan for the injuries at issue is $24,-000.00 — $2,000.00 per month of treatment for his injuries related to the accident. *679 See Sanchez v. Dubuc, 12-526, p. 10 (La.App. 5 Cir. 2/21/13), 110 So.3d 1140, 1146 (noting that “[e]ven without disc involvement, there is support in the jurisprudence for an award of $2,000 to $2,500 per month for soft tissue injuries” and collecting cases illustrating such awards); Edwards v. GEICO Indem. Co., 14-606 (La.App. 3 Cir. 3/18/15), 167 So.3d 957, (holding that “awards in the $30,000 range are reserved for treatment of longer duration and injuries that significantly affect quality of life”). As to Mr. Watson, we find the highest reasonable award for the injuries at issue' is $15,000.00. See Lohenis v. Rousse, 14-1078 (La.App. 1 Cir. 3/9/15), 166 So.3d 1020, (awarding $15,000.00 in general damages for the aggravation of pre-existing injuries despite that “it was not clear to the district court [and] ... not clear from the record and exhibits before [the appellate] court when the plaintiffs chronic neck and back pain returned to its ‘pre-accident state.’”); Edwards, supra. We thus lower the general awards as follows: Mr. Hamdan, from $37,000.00 to $24,000.00; and Mr. Watson, from $36,000.00 to $15,000.00.

Award to Ms. Hamdan

At the close of Plaintiffs’ case, IESI sought a dismissal of Ms. Hamdan’s claim for property damages — her $500.00 policy deductible — on the basis that the trial court did not allow any testimony regarding her payment of the deductible. The trial court denied the motion to dismiss. On appeal, IESI contends that the trial Isscourt erred in awarding Ms. Ham-dan her deductible given the lack of any evidence to support her claim. We find this argument unpersuasive. At trial, Mr. Hamdan, having knowledge of his mother’s affairs, testified that the pick-up truck he was driving belonged to his mother, Ms. Hamdan. He further testified that the pick-up truck was declared a total loss. A certified copy of the insurance policy was stipulated to and entered into evidence, which reflected that the policy had a $500.00 property damage deductible. We thus find no manifest error in the trial court’s award of: $500.00 in special damages to Ms. Hamdan for her deductible.

DECREE

For the foregoing reasons, the trial court’s judgment is amended to reallocate fault 80% to Mr. Hicks, and 20% to Mr. Hamdan; to amend the general damages awards to Mr. Hamdan to $24,000.00, and Mr. Watson to $15,000.00; to amend the special damage award to Mr. Hamdan to $11,023.80; and to reduce all Plaintiffs’ damage awards by the 20% fault reallocated to Mr. Hamdan. As amended, the trial court’s judgment is affirmed.
AMENDED AND, AS AMENDED, AFFIRMED.

. We also amend the judgment to correct a minor (less than one dollar) mathematical error in the trial court's calculation of the, special damage award to Mr. Hamdan.

. A "bus lane” is "the shoulder area designated ‘No stopping' [adjacent to a bus stop.]” Winfield v. Dih, 01-1357, p. 9 (La.App. 4 Cir. 4/24/02), 816 So.2d 942, 948. The governing ordinance for bus lanes is Orleans Parish Ordinance § 154-875, "Restricted use of a bus stop, livery and taxicab stands,” which provides:
No person shall stop or park a vehicle other than a bus in a bus stop, other than a livery vehicle in a livery stand or other than a taxi in a taxicab stand, when any such stop or stand has been officially designated and appropriately signed, except that the driver of passenger vehicle may temporarily stop therein for the purpose of and while actually engaged in loading or unloading passengers, when such stopping does not interfere with any bus, livery vehicle, or taxicab waiting to enter or about to enter such zone. All such vehicles when parking or stopping shall be parallel and adjacent to the curb.

. Although Mr. Hicks testified that the right lane of travel was not obstructed by his garbage truck, the photograph introduced into evidence, which is reproduced elsewhere in this opinion, belies his testimony. Nonetheless, the photograph establishes that the bus lane, located to the right, was unobstructed.

. As indicated in its motion to transfer, IESI does business under the name Coastal Waste Services.

.On January 6, 2011, in Suit 3, the trial court granted the plaintiff’s "Partial Voluntary Motion and Order to Dismiss" HUB as a defendant with prejudice. On February 2, 2011, in Suit 1, the trial court granted HUB’s motion for partial summary judgment, dismissing HUB with prejudice. HUB's motion for summary judgment was based on the fact that it was not IESI’s insurer, but rather its insurance broker.

. Although Mr. Watson was a passenger in Mr. Hamdan’s vehicle, he testified in his deposition that he was in the backseat and that he did not recall anything until after the accident occurred,

. Although three cases were filed as a result of the accident in question, the cases were consolidated. In the consolidated cases, a total of six defendants were named. At the time of the trial, only two defendants remained — IESI and Mr. Hicks. IESI points out in its post-trial memorandum and its appellant brief that Mr. Hicks was never properly served; thus, he was not a proper defendant. According to IESI, it was the sole defendant joined at trial. Indeed, the record reflects that IESI was the only defendant that made an appearance at trial. The trial court’s judgment from which this appeal is taken, however, lists, and casts in judgment, three defendants — IESI, HUB, and Mr. Hicks. Neither HUB nor Mr. Hicks is a party to this appeal. Only IESI filed an appeal. In its appellant brief, IESI does not address the issue of the inclusion of Mr. Hicks and HUB in the judgment. The issue is thus not before us on appeal, and we do not address it. Nonetheless, we note that HUB was dismissed as a party from both of the suits in which it was named as a defendant. We also note that IESI acknowledged at trial and in its appellant brief that at the time of the accident Mr. Hicks was driving an IESI's garbage truck in the course and scope of his employment with IESI.

. Drivers entering the highway are required to “use every reasonable means available to ascertain that their entry onto the highway is made in safety, and such drivers are required to keep a lookout for vehicles on the highway and desist from entering until it is apparent to a reasonably prudent person that such can be done in safety.” Herbert, 01-355 atp. 13, 807 So.2d at 1124-25 (citing La. R.S. 32:124 and Corvers v. Acme Truck Lines, 95-925, pp. 3-4 (La.App. 5 Cir. 4/16/96), 673 So.2d 1088, 1090); see also Wells v. Allstate Ins. Co., 510 So.2d 763, 767 (La.App. 1st Cir.1987). "This duty becomes more onerous as the hazards increase and requires a motorist to use every reasonable means available to ascertain. that his entiy onto the highway may be made in safety.” Loveday v. Travelers Ins. Co., 585 So.2d 597, 602 (La.App. 3rd Cir.1991).

. IESI cites the following three cases in support of its contention that Mr. Hicks acted reasonably by looking before pulling out in the garbage truck onto Carrollton: Walley v. Vargas, 12-0022 (La.App. 1 Cir. 9/21/12), 104 So.3d 93; Silvio v. Rogers, 580 So.2d 434 (La.App. 2d Cir.1991); and Schexnayder v. Guillory, 280 So.2d 239 (La.App. 4th Cir.1973).

. According to Mr. Watson, he was seated in the back seat of the pick-up, and he was not wearing a seat belt. As a result of the accident, he hit the side of his head and lost consciousness. Mr. Watson’s complaints following the accident were head, back, and neck pain. Mr. Watson testified that a few days after the accident, Mr. Hamdan, who was his landlord, came to collect the rent from him. Mr. Hamdan found him on the floor; he had passed out. Mr. Hamdan took Mr. Watson to the Ochsner emergency room. As noted elsewhere, Mr. Watson was admitted to the hospital for two days. (Although Mr. Watson testified he was hospitalized for five days, the parties stipulated it was only two days.) Mr. Watson acknowledged that he was in a prior motor vehicle accident in June 2009 and a prior bicycle accident.

. Although in his direct testimony Mr. Ham-dan denied being issued a ticket or citation, he acknowledged on cross-examination that the police report accurately indicated that he was issued a citation for no proof of insurance and no registration. He explained that he had insurance and registration, but he did not have proof of insurance or the .registration in the vehicle.

. According to Mr. Hamdan, he was not wearing his seatbelt when the accident occurred. He acknowledged that he was being treated by a physician before the accident for lower back, neck, nose, and wrist injuries. As a result of the accident, he testified that he suffered injuries to his neck, facial area, wrist, and knee. He denied that these injuries were all the same as those for which he was already treating. The difference, he testified, was his "wrist, knee, and facial.” He estimated that his injuries as a result of this accident lasted more than six months. He testified these injuries interfered with his ability to pick up heavy objects, to exercise, to lift weights, to drive, to work, and to engage in his "daily life routine."

. The correct total of the medical bills the trial court references in its reasons for judgment is $11,023.80, not $11,023.38. As noted at the outset, we amend the trial court's judgment to correct this apparent error in calculating the amount of special damages awarded to Mr. Hamdan.

. At this initial visit after the accident with Metropolitan Health Group, which was on August 18, 2009, Mr. Hamdan acknowledged that he was continuing to receive treatment for injuries to his neck and back that he sustained in an accident two months earlier (June 2009). He reported that those injuries had not resolved.

. As noted elsewhere, in his deposition, Mr. Watson states that he was admitted for five days to the. hospital. The parties stipulated that this was inaccurate and that his hospital admission was for only two days. The hospital records reflect that he was admitted four days after the accident.

. See Bozeman v. State, 03-1016, p. 22 (La.7/2/04), 879 So.2d 692, 705-06 (holding that "Medicaid recipients are unable to collect the Medicaid 'write-off’ amounts as damages because no consideration is provided for the benefit” and that “plaintiff’s recovery is limited to what was paid by Medicaid.”).

. The term cephalalgia is defined as "headache, a pain in the head.” P.H. Collin, DICTIONARY OF MEDICINE 75 (3d ed. 2000).

. The term syncope is defined as a "fainting fit, becoming unconscious for a short time because of reduced flow of blood to the brain." DICTIONARY OF MEDICINE, supra at 443.

. This finding is supported by the recommendations made by Dr. Alden in his reports regarding Mr. Hamdan’s office visits on the following three dates:
• May 27, 2010 — (i) Continue medications as prescribed and directed, (ii) The patient has reached maximum medical benefit from the modalities of treatment which we can provide here in the office. The patient must obtain MRI studies to proceed with further treatment, (iii) We will treat the patient for one more month. If we do not obtain MRI studies on the patient, we will have to discharge him from the office since he has reached maximum medical benefit from the treatment program here in the office.
• June 25, 2010 — (i) Appropriate medication instructions and precautions were issued, (ii) The patient is given a referral for orthopedic evaluation of chronic neck and back pain, (iii) The patient is to continue with conservative treatment here in the office, (iv) The patient is asked to return after his orthopedic evaluation.
• August 19, 2010 — (i) Appropriate medication instructions and precautions Were issued, (ii) The patient is given a referral to orthopedics for further evaluation, (iii) The patient has reached the maximum medical benefit from the modalities of treatment which we can provide here in the office, (iv) The patient is more than welcome to return after his orthopedic treatment is completed.

. The issue of causation of damages, which IESI raises, is interrelated to the issue of general damages. We thus address these two issues together.